**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **GAIL, JOHN D. AND JOHN F. CORVELLO; et al.,** **Plaintiffs,** | ) | |
| **v.** | ) | **C.A. No. 05-221T** (Related Case No. 05-274T, 05-370T, 05-522T) |
| **NEW ENGLAND GAS COMPANY, INC.;** **Defendant.** | ) | |

**NOTICE OF TAKING DEPOSITION**

The plaintiffs in the above-captioned matter will take the deposition of defendant New England Gas Company or its successors (hereinafter "NEGCo") pursuant to Fed.R.Civ.P. 30. The deposition will be taken on November 28, 2007, at 10:30AM at the offices of Kasowitz Benson Torres & Friedman, LLP, 1633 Broadway New York, NY 10019. Pursuant to Fed.R.Civ.P. 30(b)(6), the plaintiffs request that NEGCo designate one or more of its officers, directors or managing agents or other persons who consent to testify on its behalf with regard to the matters set forth in Schedule A, attached hereto. NEGCo is also requested pursuant to Fed.R.Civ.P. 30(b)(5) to produce for inspection and copying any documents in its possession, custody or control that are described in Schedule B, attached hereto. The deposition will be taken before a notary public and will continue from day to day until completed. You are invited to attend and cross examine.

Dated this 21st day of November, 2007.

Attorneys for the Plaintiffs Gail, John D. and John F. Corvello, et al,
By their Attorneys

/s/ Christian F. Uehlein
David C. Strouss
Neil T. Leifer
Brad J. Mitchell
Christian F. Uehlein
**THORNTON & NAUMES, LLP**
100 Summer Street, 30th Floor
Boston, MA 02110
(617) 720-1333

Robert J. McConnell (#3888)
Jonathan D. Orent (#7408)
**MOTLEY RICE, LLC**
321 South Main Street
Providence, RI 02940
(401) 457-7700

Mark W. Roberts
**MCROBERTS, ROBERTS & RAINER, LLP**
53 State Street
Boston, MA 02109
(617)-722-8222
(617)-720-2320 Fax

**Certificate of Service**

I hereby certify that on this 21st Day of November a copy of the foregoing was served electronically via the ECF system.

/s/ Christian F. Uehlein
Christian F. Uehlein

**Plaintiffs' Counsel**

Paul Revere, III
Law Offices of Paul Revere, III
226 River View Lane
Centerville, MA 02632
(508) 778-7126
ReverelII@aol.com

Brian R. Cunha
Law Offices of Brian Cunha & Associates
311 Pine Street
Fall River, MA 02720
brian@briancunha.com

Richard J. Zabbo, Esq.
Ratcliffe Burke Harten & Elias LLP
160 Financial Plaza
Providence, RI 02903
401-490-4649 direct
401-331-3400 main
401-331-3440 fax
rzabbo@rbhelaw.com

**Southern Union**

David A. Wollin, Esq.
Adler Pollock & Sheehan, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
401-274-7200
dwollin@apslaw.com

John Tarantino, Esq.
Adler Pollock & Sheehan, P.C.
175 Federal Street, 10th Floor
Boston, MA 02110
617-482-0600
617-482-0604
jtarantino@apslaw.com

Kristen W. Sherman
Adler Pollock & Sheehan P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903
274-7200
Fax: 351-4607
Email: ksherman@apslaw.com

David E. Ross, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
212-506-1700
212-506-1800
dross@kasowitz.com

Seth Davis
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
212-506-1790
Fax: 212-506-1800

Eric D. Herschmann
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
212-506-1700
Fax: 212-506-1800

Email: eherschmann@kasowitz.com

Noelle Kowalczyk
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019
212-506-1700
Fax: 212-506-1800

Gerald J. Petros
Hinckley, Allen & Snyder
50 Kennedy Plaza
Suite 1500
Providence, RI 02903

Email: gpetros@haslaw.com

Robin-Lee Main
Hinckley Allen & Snyder
50 Kennedy Plaza
Suite 1500
Providence, RI 02903-0819
Email: rmain@haslaw.com

Christina C. Dodds
Bishop London Brophy Dodds, P.C.
3701 Bee Cave Road
Austin, TX 78746
Email: CDodds@bishoplondon.com

Noelle Kowalczyk
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

**INTERESTED PARTIES:**

**RIDEM**

Lewis S. Wiener, Esq.
Sutherland, Asbill & Brennan LLP
1375 Pennsylvania Ave, NW
Washington, DC 20004-2415
Email: lewis.wiener@sablaw.com

Patty Allison Fairweather, Esq.
Executive Counsel
State of Rhode Island
Department of Environmental Management
Office of Legal Services
235 Promenade Street
Providence, RI 02908-5767
patty.fairweather@dem.ri.gov

Gerald J. Pels, Esq.
Sutherland, Asbill & Brennan, LLP
2 Houston Center
909 Fannin, Suite 2200
Houston, TX 77010
gerry.pels@sablaw.com

Gregory S. Schultz, Esq.
Legal Counsel
State of Rhode Island
Department of Environmental Management
Office of Legal Services
235 Promenade Street
Providence, RI 02908-5767
gregory.schultz@dem.ri.gov

Susan B. Forcier
R.I. Department of Environmental Mngt.
Office of Legal Services
235 Promenade Street
Fourth Floor
Providence, RI 02908

Email: susan.wilson@dem.ri.gov

Brian A. Wagner
RI Department of Environmental Management
Office of Legal Services
235 Promenade Street, 4th Floor
Providence, RI 02908

Email: brian.wagner@dem.ri.gov

**RI Governor Donald L. Carcieri**

Matthew B. Smith
Matthew B. Smith, Esq., Attorney At Law
1206 Westminster St.
Providence, RI 02909
Email: matthew@verdecchialaw.com

Michael D Mitchell, Esq.
Department of Administration
One Capitol Hill
Providence, RI 02908
Email: mmitchell@admin.ri.gov

**Jose Souza**

Michael K. Marran
P.O. Box 6067
321 South Main St.
Suite 200
Providence, RI 02940-6067

**THIRD PARTY DEFENDANTS**

Gulf Oil Corporation

Bruce Gregory Tucker, Esq.
55 Hammarlund Way
Middletown, RI 02842
Email: btucker@legalmgt.com

Gulf Oil Corp

David B. Willis, Esq.
Legal Management Services, LLC
55 Hammarlund Way
Middletown, RI 02842

Gulf Oil Corporation

David A. Crichlow
Pillsbury Winthrop Shaw Pittman, LLP
1540 Broadway
New York, New York 10036

Gulf Oil Corporation

David M. Goldberg
Pillsbury Winthrop Shaw Pittman, LLP
1540 Broadway
New York, New York 10036

Bridgestone Firestone North American Tire, LLC; Bridgestone Americas Holdings, Inc.:

Benjamin V. White, III Esq.
Kimberly A. Simpson, Esq.
Vetter & White Inc.
20 Washington Place
Providence, RI 02903
bwhite@vetterandwhite.com
ksimpson@vetterandwhite.com

Bridgestone Firestone North American Tire, LLC; Bridgestone Americas Holdings, Inc.:

William David Wick
Wactor & Wick LLP
180 Grand Avenue
Suite 950
Oakland, CA 94612

Honeywell International, Inc

Gregory L. Benik, Esq.
Nixon Peabody LLP
One Citizens Plaza
Providence, RI 02903
Email: gbenik@nixonpeabody.com

Inland Fuel Terminals, Inc

Paul M. Sanford, Esq.
Burns & Levinson LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
Email: psanford@burnslev.com

Inland Fuel Terminals, Inc.

Christopher P. McCormack, Esq.
PULLMAN & COMLEY, LLC
850 Main Street P.O. Box 7006
Bridgeport, CT 06601-7006
Email: cmccormack@pullcom.com

Town of Tiverton:

Jeanne M. Scott
URSILLO, TEITZ & RITCH, Ltd.
2 Williams Street
Providence, RI 02903
Email: Jeannescott@utrlaw.com

Dominion Resources, Inc
Dominion Energy Brayton Point LLC :

Craig R. Waksler, Esq.
Taylor Duane Barton and Gilman, LLP
10 Dorrance Street, Ste 700
Providence, RI 02903

City of Fall River:

Thomas F. McGuire, Jr.
City of Fall River
Corporation Counsel
1 Government Center, 6th Floor

Dominion Resources, Inc
Dominion Energy Brayton Point LLC :

Christian B.W. Stephens, Esq.
Taylor Duane Barton and Gilman, LLP
10 Dorrance Street, Ste 700

Fall River, MA 02722

Providence, RI 02903

Thomas F. McGuire, Jr.
LAW OFFICES OF MCGUIRE &
COUGHLIN, P.C.
The Academy Building
70 South Main Street
P.O. Box 1187
Fall River, MA 02722-1187
Tmcguire@meganet.net

Dominion Resources, Inc
Dominion Energy Brayton Point LLC :

Andrew G. Mauck
Troutman Sanders LLP
P.O. Box 1122
1001 Halifax Point
Richmond, VA 23208

Schedule A

1. The factual basis for NEGCo's proof of claim in *In re Stone & Webster, Incorporated, et al,* Case No. 00-02142 (PJW) regarding Stone & Webster's alleged operation, management and control of the Fall River Gas Company which is described more fully in Exhibit 1, which is attached hereto.
2. The factual basis for NEGCo's statement in the Settlement Agreement signed by Southern Union in *In re Stone & Webster, Incorporated, et al,* Case No. 00-02142 (PJW) which is more fully described at Page 2, Section H of Exhibit 2, which is attached hereto.
3. Any documents received by NEGCo from Stone & Webster, Inc. or any other entity in connection with any litigation involving Stone & Webster, Inc. concerning coal gasification processes at Fall River Gas Company.

Schedule B

1. Any documents which support the statements made by NEGCo in its proof of claim attached hereto as Exhibit 1.
2. Any documents which support the statements made or agreed to by Southern Union in Exhibit 2.
3. Any documents received by NEGCo from Stone & Webster, Inc. or any other entity in connection with any litigation involving Stone & Webster, Inc. concerning coal gasification processes at Fall River Gas Company.

# EXHIBIT 1

FORM B10

UNITED STATES BANKRUPTCY COURT— DISTRICT OF DELAWARE

| Name of Debtor | Case Number | |
|---|---|---|
| Stone & Webster Management Consultants, Inc. | 00-2194 (PJW) Jointly Admin. | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**Southern Union Company**

Name and address where notices should be sent:

John T. Coghlan
Lathrop & Gage L.C.
2345 Grand Blvd., Suite 2800
Kansas City, MO 64108

Telephone number: (816) 292-2000

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope.

THIS SPACE FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Check here if this claim ☐ replaces ☐ amends a previously filed claim.

**1. Basis for Claim**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other: **Indemnification Claims for Environment Matters-See Attached Supplemental Statement for explanation**

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Your SS#:__________
Unpaid compensation for services performed
__________ to __________
(date) (date)

**2. Date debt was incurred:** approx. 1890-present

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $22,935,168.61 liquidated past costs, plus an undetermined future amount. See attached Supplemental Statement.

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest of additional charges.

**5. Secured Claim**

☐ Check this box if your claim is secured by collateral *(including a right of setoff).*

Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle
☐ Other __________

Value of Collateral: $__________

Amount of arrearage and other charges at time case filed included in secured claim, if any: $__________

**6. Unsecured Priority Claim.**

☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $__________
Specify the priority of the claim:

☐ Wages, salaries, or commissions (up to $4,300),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier — 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan -- 11 U.S.C. § 507(a)(4).
☐ Up to $1,950* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use -- 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to governmental units -- 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units -- 11 U.S.C. § 507(a)(8).
☐ Other -- Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

*Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commercial on or after the date of adjustment.

7. **Credits:** The amount of all payments of this claim has been credited and deducted for the purpose of making this proof of claim.

8. **Supporting Documents:** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

9. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE FOR COURT USE ONLY

5425 ML

RECEIVED
MAY 20 2003
TRUMBULL SERVICES COMPANY
5/20/03

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|
| 5/19/2003 | [signature] William G. Beck, Lathrop & Gage L.C., attorney and agent for Southern Union Company |

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

***The instructions and definitions are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily be a debtor, there may be exceptions to these general rules.***

## —Definitions—

*Debtor*

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

*Creditor*

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

*Proof of Claim*

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

*Secured Claim*

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also Unsecured Claim.)

*Unsecured Claim*

If a claim is not a secure claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

*Unsecured Priority Claim*

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as Unsecured Nonpriority Claims.

## Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**
Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information About Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**
Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**
Fill in the date when the debt first was owed by the debtor.

**3. Court Judgments:**
If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Total Amount of Claim at Time Case Filed:**
Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**5. Secured Claim**
Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above.)

**6. Unsecured Priority Claim**
Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above.) A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by law. Check the appropriate place to specify the type of priority claim.

**7. Credits**
By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

**8. Supporting Documents**
You must attach to this proof of claim form copies of documents that show the debtor owes the debt claims or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

**Supplemental Statement in Support of Southern Union's Proof of Claim Against the Debtor Stone & Webster Management Consultants**

Southern Union Company's ("Southern Union") proof of claim against Stone & Webster Management Consultants arises out of Southern Union's acquisition of various entities known as Providence Gas, Fall River Gas Company, Valley Gas, and Pennsylvania Gas Company (collectively referred to as the Northeast Division). The Northeast Division is a group of public utility companies located primarily in the Northeast part of the country. The merger between Southern Union and these various public utilities occurred sometime before and after the Debtor filed for bankruptcy protection. As a result of its mergers with these public utilities, Southern Union acquired potential liability for environmental cleanup costs at or near manufactured gas facilities of these public utilities (the "Environmental Claims").

From the early 1900's through the mid-1950's, and possibly later, Stone & Webster[1] operated, managed or controlled the various operations of these public utilities. Stone & Webster, in its oversight and management capacity, caused environmental contamination through various actions giving rise to the Environmental Claims. As a result, Stone & Webster is a potentially responsible party with respect to the Environmental Claims under certain state and federal environmental laws.

At this time, Southern Union has paid actual past costs in connection with the Environmental Claims totaling $22,935,168.61, and estimates the total liability for the Environmental Claims to be very substantial. For confidentiality reasons, Southern Union does not include with this Proof of Claim any individual costs estimates for each

[1] As used herein, Stone & Webster refers to Stone & Webster, Inc. and its subsidiaries, predecessors, and related entities, including but not limited to, Stone & Webster Engineering Corporation and Stone & Webster Management Consultant, Inc.

site. If such costs estimates are necessary, Southern Union will, for confidentiality reasons, seek the Court's permission to file such documents under seal. Southern Union has attached charts pertaining to the various public utilities which set out the location of the contaminated sights and the amount of actual past costs that Southern Union has incurred to date.

Southern Union hereby makes a demand on Stone & Webster for reimbursement and indemnification of all costs, expenses and liabilities that Southern Union either has already incurred or may incur in the future as a result of the Environmental Claims. In addition, Southern Union reserves the right to modify, supplement or amend this proof of claim.

# SOUTHERN UNION COMPANY
# PROVIDENCE GAS FMGP SITES

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **2 Allens Ave. & Globe FMGP**<br>NE corner of Globe St. &2 Allens Ave. (Point & Eddy), Providence, RI | 1910 | $152,861.00 | Original Providence Gas Company Operation |
| **170 Allens Ave. FMGP**<br>(Public St.) Providence, RI | 1916 | $243,176.27 | Original Providence Gas Company Operation |
| **642 Allens Ave. FMGP**<br>N. corner of Allens Ave. & Terminal Rd., Providence, RI | 1956 | $17,436,459.26 | Original Providence Gas Company Operation |
| **Ashburton & Conanicut (Holder)**<br>Inez Ct. & Tremont or Route 95 Overpass, Providence, RI | 1920 | | Original Providence Gas Company Holder |
| **20 Blackstone (Gas Regulator)**<br>Eddy St. & I-95, Providence, RI | 1956 | | Original Providence Gas Company Holder |
| **30 Blackstone (Holder)**<br>Eddy St. & I-95 (Rhode Island Hosp. parking lot), Providence, RI | 1976 | $37,885.00 | Original Providence Gas Company Holder |
| **Crary & Hospital (Holder)**<br>70-98 Crary & 129-139 Hospital St., Providence RI | 1920 | | Original Providence Gas Company Holder |
| **477 Dexter (UST)**<br>Providence, RI | unknown | $442,187.00 | Underground Storage Tank |
| **Federal & Cory (Holder)**<br>51 Federal & 2-14 Merrill & 36-50 Cory, Providence, RI | 1920 | | Original Providence Gas Company Holder |
| **First & Mauran (Holder)**<br>37-65 First & 101-107 Mauran, East Providence, RI | 1960 | | Original Providence Gas Company Holder |
| **Hartford & Petteys (Holder)**<br>576 Hartford/168 Petteys Ave., Providence, RI | unknown | | Original Providence Gas Company Holder |

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Huntington & Dike (Holder)**<br>111-21 Huntington (Norfolk) and 1-19 Dike (S. of Westminster St.), Providence, RI | 1920 | | Original Providence Gas Company Holder |
| **Koppers Company**<br>Rt. 195 and Massasoit (at the Henderson Bridge), Providence, RI | 1956 | | Tar Processor owned by Koppers. Providence Gas Company may have sold tar to Koppers; cost estimate is for remediation of tars potentially associated with Providence Gas Company operations. |
| **Mechanic & Dryden (Holder)**<br>8-26 Mechanic & 125-173 Printery near Dryden St. (Thurber Ln.), Providence, RI | 1917 | | Original Providence Gas Company Holder |
| **Pike & Benefit FMGP**<br>20-50 Pike & 470-490 Benefit St (S. Main & Tockwotton St.), Providence, RI | 1878 | | Original Providence Gas Company Operation (known as East Station) |
| **Plain & Lockwood (Holder)**<br>129-141 Plain & 60-72 Lockwood (Plain St at Oldham & Pearl St.), Providence, RI) | 1920 | | Original Providence Gas Company Holder |
| **Westfield & Fuller (Holder)**<br>42 Westfield & Fuller, Providence, RI | 1920 | | Original Providence Gas Company Holder |
| **Thames & Wellington FMGP**<br>543 Thames St., Newport, RI | Mid-1950s | $605,762.00 | Operated by Newport Gas Light Company. Southern Union acquired Newport Gas Light Company on December 31, 1974. |
| **Thames & Lee FMGP**<br>(between Lee St. & McAllister) Newport, RI | 1890 | | Operated by Newport Gas Light Company. Southern Union acquired Newport Gas Light Company on December 31, 1974. |

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Canal Street FMGP**<br>1418 Canal St., Westerly, RI | after 1964 | $63,268.98 | Operated by Westerly Gas and Electric Company, which became Westerly Light and Power, then Narragansett Electric Company. The site was conveyed to Providence Gas Company, the current owner of the site. |
| **Industrial Drive (Holder)**<br>(between Canal St. & Pleasant St.)<br>Westerly, RI | after 1964 | | Operated by Westerly Gas and Electric Company, which became Westerly Light and Power, then Narragansett Electric Company. This holder was associated with the Canal Street FMGP. |
| **Bradford Dye (Holder)**<br>State Rte 191, Westerly RI | unknown | | Unknown |
| **East Street (Holder)**<br>(between Orne & Elm Street)<br>North Attleboro, MA | 1947 | | Operated by North Attleboro Gas Light Company, which was acquired by Providence Energy in 1987. |
| **Mt. Hope & Commonwealth FMGP**<br>(SE corner), North Attleboro, MA | after 1965 | | Operated by North Attleboro Gas Light Company, which was acquired by Providence Energy in 1987. |
| **Mt. Hope & Elm (Holder)**<br>(NW corner), North Attleboro, MA | after 1965 | | Operated by North Attleboro Gas Light Company, which was acquired by Providence Energy in 1987. |
| Mercury Meter/Regulator Remediation | | $510,674 | Costs for Mercury Meter/ Regulator Remediation |
| **Totals:** | | $19,492,273.51 | |

SOUTHERN UNION COMPANY
FALL RIVER FMGP SITES

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Charles & Bay St. FMGP**<br>NW corner of Charles St. at Bay St., Fall River, MA | after 1976 | | Originally operated by Fall River Gas Company |
| **5th & Hartwell FMGP**<br>SE corner of 5th St. at Hartwell, Fall River, MA | after 1950 | $14,063.63 | Originally operated by Fall River Gas Company |
| **Pond & Anawan FMGP**<br>SE corner of Water St and Anawan St., Fall River, MA | after 1950 | | Originally operated by Fall River Gas Company |
| **Robeson & Cherry (Holder)**<br>NE Corner of Robeson and Cherry, Fall River, MA | after 1950 | | Originally operated by Fall River Gas Company |
| **Turner & Davol (Holder)**<br>SE Corner of Turner and Davol Sts., Fall River, MA | after 1905 | | Originally operated by Fall River Gas Company |
| **Cory's Lane/Andrade FMGP**<br>Cory's Lane and Stafford Rd Tiverton, RI | 1930s | $322,717.73 | Offsite disposal location of Fall River Gas Company |
| **Plympton FMGP**<br>45 Main and 132 Mayflower, Plympton, MA | unknown | $77,333.00 | Offsite disposal location of Fall River Gas Company |
| Totals: | | **$414,114.36** | |

CC 1161745v2

## SOUTHERN UNION COMPANY
## VALLEY RESOURCES FMGP SITES

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Lawn & Knoll**<br>Attleboro, MA | 1910 | | Offsite disposal location used by Blackstone Valley Gas & Electric Company. |
| **Mendon Rd. Site**<br>499-501 Mendon Road, Attleboro, MA | 1910 | $311,368.70 | Offsite disposal location used by Blackstone Valley Gas & Electric Company. |
| **High Street FMGP**<br>High & Elm, Central Falls, RI | after 1965 | | Pawtucket Gas Company originally operated the site, then Blackstone Valley Gas & Electric Company. |
| **Pawtucket Water Supply Board Site,** North of Myrtle St., Cumberland, RI | unknown | | Offsite disposal location used by Blackstone Valley Gas & Electric Company. |
| **Exchange Street (Holder)**<br>Exchange & Roosevelt (otherwise known as Mill or N. Main), Pawtucket, RI | before 1923 | | Pawtucket Gas Company originally operated the site, then Blackstone Valley Gas & Electric Company. |
| **Tidewater FMGP**<br>Taft & Tidewater, Pawtucket, RI | 1968 | $287,245.74 | Pawtucket Gas Company originally operated the site, then Blackstone Valley Gas & Electric Company. |
| **Hamlet Avenue FMGP**<br>Hamlet & Front St., Woonsocket, RI | 1913 | $ 96,798.67 | Woonsocket Gas Company originally operated this site, then Blackstone Valley Gas & Electric Company. |
| **Pond Street (Holder)**<br>Pond & Mechanic Ave., Woonsocket, RI | before 1911 | $7,002.11 | Woonsocket Gas Company originally operated this site, then Blackstone Valley Gas & Electric Company. |
| | | $702,415.22 | |

# SOUTHERN UNION COMPANY
# PG ENERGY FMGP SITES

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Berwick FMGP**<br>9th & Oak St., Berwick, PA | 1951 | | Berwick Gas Company operated this site. Scranton-Spring Brook Water Supply Company purchased Berwick Gas Company in 1958 and then changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |
| **Bloomsburg FMGP/**<br>7th & Market, Bloomsburg, PA<br>**Railroad St. (Holder)/**<br>Danville, PA<br>**Market St. (Holder)**<br>Market & Carpenter, Muncy, PA | 1962<br><br>1962<br><br>after 1949 | | Pennsylvania Power & Light and/or its predecessors operated this site. In 1951, Pennsylvania Power & Light sold the manufactured gas property to Scranton-Spring Brook Water Supply Company. Scranton-Spring Brook Water Supply Company changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |
| **Carbondale FMGP**<br>8th and River St., Carbondale, PA | 1952 | | Carbondale Gas Company operated this site. Eventually the site was sold to Scranton-Spring Brook Water Supply in 1951. Scranton-Spring Brook Water Supply changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Plymouth Ave (Holder)**<br>Plymouth & Russell, Edwardsville, PA | after 1962 | | UGI and/or its predecessors operated this site. UGI conveyed the site to Scranton-Spring Brook Water Supply Company in 1955. Scranton-Spring Brook Water Supply changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |
| **Filbert Street FMGP #1**<br>Filbert & Limestone Creek, Milton, PA<br>**Filbert Street FMGP #2** (Storage)<br>Filbert & Race St., Milton, PA<br>**Filbert Street FMGP #3** (Holder)<br>Filbert & Race St., Milton, PA<br>**3rd & Wagner (Holder)**<br>3rd & Wagner, Montgomery, PA | 1932<br><br>after 1961<br><br>after 1961<br><br>after 1948 | | Pennsylvania Power & Light and/or its predecessors operated this site. In 1951, Pennsylvania Power & Light sold the manufactured gas property to Scranton-Spring Brook Water Supply Company. Scranton-Spring Brook Water Supply Company changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |
| **Walnut Street FMGP & Holder** | 1960 and 1927 | | UGI and/or its predecessors operated this site. UGI conveyed the site to Scranton-Spring Brook Water Supply Company in 1955. Scranton-Spring Brook Water Supply changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |
| **Scranton FMGP**<br>Bridge St. & Lackawanna River, Scranton, PA<br>**Scranton Holder**<br>Albright & Marion, Scranton, PA | 1957<br><br>1941 | $2,867.15 | Scranton Gas & Water Company operated the site, followed by Scranton-Spring Brook Water Supply Company. Scranton-Spring Brook Water Supply changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Sunbury FMGP**<br>Gashouse Alley & Arch St., Sunbury, PA | 1932 | 235,870.62 | Pennsylvania Power & Light and/or its predecessors operated this site. In 1951, Pennsylvania Power & Light sold the manufactured gas property to Scranton-Spring Brook Water Supply Company. Scranton-Spring Brook Water Supply Company changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |
| **Wilkes-Barre FMGP**<br>20N. Water St., Wilkes-Barre, PA<br>**Wilkes-Barre (Holder)**<br>Darling St. and Reichard, Wilkes-Barre, PA | 1957<br><br>1932 | | Pennsylvania Power & Light and/or its predecessors operated this site. In 1951, Pennsylvania Power & Light sold the manufactured gas property to Scranton-Spring Brook Water Supply Company. Scranton-Spring Brook Water Supply Company changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |
| **Williamsport FMGP**<br>Mulberry & Bennett St., Williamsport, PA<br>**3rd & Rose (Holder)**<br>Williamsport, PA<br>**Washington St. (Holder)**<br>S. Alley & Washington St., Montoursville, PA | 1932<br><br>unknown<br><br>after 1946 | | Pennsylvania Power & Light and/or its predecessors operated this site. In 1951, Pennsylvania Power & Light sold the manufactured gas property to Scranton-Spring Brook Water Supply Company. Scranton-Spring Brook Water Supply Company changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Sixth Street (Holder)**<br>6th and Ave. A, Wyoming, PA | 1967 | | UGI and/or its predecessors operated this site. UGI conveyed the site to Scranton-Spring Brook Water Supply Company in 1955. Scranton-Spring Brook Water Supply changed its name to Pennsylvania Gas & Water Company in 1960. Pennsylvania Enterprises was created as a holding company for Pennsylvania Gas & Water Company in 1974. |
| **Totals:** | | 238,737.77 | |

SOUTHERN UNION COMPANY
SOUTHERN UNION FMGP SITES

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Prescott FMGP**<br>N. Granite & W. Sheldon St, Prescott, AZ | 1924 | | Northern Arizona Power & Light operated this site. In 1954, Southern Union Gas acquired the natural gas franchise and "all right title and interest" of Arizona Public Service Company and its subsidiary, Northern Arizona Power & Light, including the Prescott operation. |
| **East Silver Ave FMGP**<br>E. Silver & S. Broadway, Albuquerque, NM | 1941 | | Albuquerque Gas & Electric Company operated this site. Southern Union Gas acquired the system in 1949. |
| **Navajo Lea Refinery**<br>Hwy 18, 5 miles southeast of Lovington, NM | unknown | $255,878.80 | Southern Union acquired all of the stock of Famariss Oil Corporation, the owner of this site, in 1975. Famariss Oil Corporation was merged into Southern Union Oil Products Company, which was then merged into Southern Union Refining in 1976. |
| **Monument Refinery**<br>End of County Road 3585<br>PO Box 980<br>Hobbs, NM | unknown | | Southern Union acquired all of the stock of Famariss Oil Corporation, the owner of this site, in 1975. Famariss Oil Corporation was merged into Southern Union Oil Products Company, which was then merged into Southern Union Refining in 1976. |
| **Roswell FMGP**<br>11th & N. Virginia (N. Pecos Ave.), Roswell, NM | 1930 | | Southwestern Pubic Service operated this site. On November 17, 1958, Southwestern Public Service sold the site to Lea County Gas Company, which then became Western Gas Service. In 1968, Southern Union merged with Western Gas Service. |

*Highly Confidential: This information is for use solely in connection with settlement discussions. The information is highly confidential, commercially sensitive ... Confidentiality Agreement.*

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Santa Fe FMGP** Paseo de Peralta (Federal/Temple) & Washington, Ave., Santa Fe, NM | 1897 | | Santa Fe Gas Company operated this site. Southern Union Gas acquired Santa Fe's gas franchise around 1930. |
| **1st & Congress FMGP** 100 Congress Ave., near 2nd & Colorado, Austin, TX | 1920 | | Austin Gas Light & Coal and, later, Austin Gas Light Company operated this site. In 1926, People's Utility of Texas Corporation purchased Austin Gas Light Company and then changed its name to Austin Gas Company. In 1929, Austin Gas Company changed its name to Texas Public Service Company, which became a wholly-owned subsidiary of People's Light & Power Corporation. In 1949, Southern Union Gas merged with Texas Public Service Company. |
| **3rd & Medina FMGP**, Austin Texas | 1928 | | Austin Gas Light & Coal and, later, Austin Gas Light Company operated this site. In 1926, People's Utility of Texas Corporation purchased Austin Gas Light Company and then changed its name to Austin Gas Company. In 1929, Austin Gas Company changed its name to Texas Public Service Company, which became a wholly-owned subsidiary of People's Light & Power Corporation. In 1949, Southern Union Gas merged with Texas Public Service Company. |

*Highly Confidential: This information is for use solely in connection with settlement discussions. The information is highly confidential, commercially* [illegible] *Confidentiality Agreement.*



CC 1161749v2

| Site & Address | Probable Last Year of Manufactured Gas Operation | Past Costs | Site History |
|---|---|---|---|
| **5th & West Avenue FMGP**, Austin, TX | unknown | | Austin Gas Light & Coal and, later, Austin Gas Light Company operated this site. In 1926, People's Utility of Texas Corporation purchased Austin Gas Light Company and then changed its name to Austin Gas Company. In 1929, Austin Gas Company changed its name to Texas Public Service Company, which became a wholly-owned subsidiary of People's Light & Power Corporation. In 1949, Southern Union Gas merged with Texas Public Service Company. |
| **Brenham FMGP**<br>Bassett & Market (between Clinton & Market), Brenham, TX | after 1965 | | Brenham Gas Company and Texas Cities Gas Company operated this site. In 1928, Union Utilities purchased the gas operation, which was to be operated by its subsidiary, Texas Cities Gas Company. In 1929, Lone Star Gas Company purchased Texas Cities Gas Company. In 1941, Texas Southwestern Gas Company, a subsidiary of Southern Union Gas, purchased Texas Cities Gas Company. |
| **3rd & Chihuahua** (FMGP)/<br>**Durazno** (Holder)/<br>**Canal Street** (Holder), El Paso, TX | 1948<br>after 1954<br>before 1970 | | El Paso Gas Company operated these sites. In 1929, Union Utilities purchased El Paso Gas Company, to be operated through Texas Cities Gas Company. In 1941, Texas Southwestern Gas Company, a subsidiary of Southern Union Gas, purchased Texas Cities Gas Company. |

*Highly Confidential: This information is for use solely in connection with settlement discussions. The information is highly confidential, [illegible] Confidentiality Agreement.*

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Galveston FMGP**<br>Blocks 512 & 452; 33rd and Ave E (Post Office St.), Galveston, TX | 1920 | $517,025.65 | Galveston Gas Company operated this site. In 1928, Union Utilities purchased Galveston Gas Company, to be operated through Texas Cities Gas Company. In 1941, Texas Southwestern Gas Company, a subsidiary of Southern Union Gas, purchased Texas Cities Gas Company. . |
| **Mineral Wells FMGP**<br>SW 3rd and SW 1st, Mineral Wells, TX | 1925 | | Palo Pinto Gas Company, and then Brazos River Gas Company, conducted operations on a portion of this site. Brazos River Gas Company merged with Southern Union in 1991. |
| **Port Arthur FMGP**<br>Terminal Rd. & West 19th, Port Author, TX | 1925 | | Port Arthur Gas & Power Company operated this site. People's Gas Company acquired the plant in 1921. In 1943, Texas Public Service Company purchased all stock and assets of People's Gas Company. In 1949, Texas Public Service Company merged with Southern Union Gas Company |
| **Weatherford FMGP**<br>606 Fort Worth St. (at Mill Rd.), Weatherford, TX | after 1943 | | Weatherford Gas Company operated this site. At some point, and at least during the 1950s and 1960s, Brazos River Company owned a portion of this site. Brazos River Gas Company merged with Southern Union in 1991. |

*Highly Confidential: This information is for use solely in connection with settlement discussions. The information is highly confidential, commercially sensitive and subject to Confidentiality Agreement.*



CC 1161749v2

| SITE & ADDRESS | PROBABLE LAST YEAR OF MANUFACTURED GAS OPERATION | PAST COSTS | SITE HISTORY |
|---|---|---|---|
| **Pine Street/ Maltex Pond Site** Pine Street (Eastern shore of Lake Champlain), Burlington, VT | unknown | $1,314,723.30 | During 1929 to 1931, People's Light & Power Corporation, the parent of Green Mountain Power Corporation, exercised operating control over this site. Through a series of transactions, Texas Public Service Company was the last standing subsidiary of the People's Light & Power conglomerate. In 1949, Texas Public Service Company merged with Southern Union Gas Company |
| Totals: | | *$2,087,627.75* | |

*Highly Confidential: This information is for use solely in connection with settlement discussions. The information is highly confidential, commercially ... Confidentiality Agreement*

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| STONE & WEBSTER, INCORPORATED, et al., | Case No. 00-02142 (PJW) |
| | Jointly Administered |
| Debtors. | |
| | Related to: 4657 |

**ORDER UNDER 11 U.S.C. §§ 105 AND 502(a) AND FED. R. BANKR. P. 9019 AND 3018 GRANTING DEBTORS' MOTION FOR ORDER APPROVING SETTLEMENT OF CLAIMS WITH SOUTHERN UNION COMPANY AND NARRAGANSETT ELECTRIC COMPANY**

Upon consideration of the Debtors'[1] motion for an order approving settlement of claims with Southern Union Company and Narragansett Electric Company (the "Motion"); and the Court having reviewed the Motion and having determined that granting the relief requested is in the best interests of the Debtors, their estates, creditors, and interest holders, and is a proper exercise of the Debtors' business judgment; and it appearing that proper and adequate notice of the Motion has been given

[1] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Motion.

and that no other or further notice is necessary; and the Court having considered the Motion and all objections thereto; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND THAT:

A. Adequate notice of the Motion and Settlement was served upon all parties with an interest in this contested matter, as well as upon all parties requesting such notice under Fed. R. Bankr. P. 2002.

B. The Settlement is in the best interests of the Debtors, their estates, creditors, and interest holders, and is also in the best interests of Narragansett Electric Company and Southern Union Company (together, the "Claimants"), and their ratepayers.

C. The Settlement is the result of good-faith, arms'-length negotiations and is a proper exercise of the Debtors' business judgment, representing a fair and reasonable compromise of the parties' claims and defenses.

D. All objections to the Motion not otherwise resolved should be overruled, and the Motion should be granted.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Motion is GRANTED.

2. Pursuant to 11 U.S.C. §§ 105 and 502(e), Fed. R. Bankr. P. 9019 and 3018, and the provisions of the Third Amended Joint Plan, the Settlement annexed as Exhibit A to this Order is approved.

3. The Debtors, or their successors, are authorized to execute any documents necessary or desirable to consummate the Settlement.

4. All objections to the Motion not resolved or withdrawn are hereby overruled in their entirety.

5. The Claimants are deemed to hold an allowed claim against the Consolidated SWINC Estate and the Consolidated SWE&C Estate, in the amount of $15,000,000.00 for actual response costs incurred to date at all of the sixteen (16) sites which are the subject of the Claimants' claims in this Court (the "Allowed Remediation Claim"), which Allowed Remediation Claim is

hereby deemed to be a vote to accept the Third Amended Joint Plan in Class 5A and Class 5B.

6. In order to effectuate the foregoing provision, Valley Gas Claim numbers 2422 and 2438 are reinstated and Fall River Claim numbers 5424 through 5429 are deemed timely filed. The Allowed Remediation Claim is an amendment to and a consolidation of claims numbered 2548, 2457, 4221, 2267, 2422, 2438, and 5424 through 5429.

7. On the effective date of the Third Amended Joint Plan, and in accordance therewith, the Claimants will receive a cash distribution of $5,000,000.00 (the "Cash Payment") in payment of the Allowed Remediation Claim. Notwithstanding any provision of the Settlement, the Cash Payment is the maximum amount and sole portion of the Allowed Remediation Claim that will be paid from the Debtors' estates or their successor entities.

8. The Debtors shall use reasonable efforts to obtain recovery from their primary insurers. To the extent the Debtors, through settlement or otherwise, recover any payments from their primary insurers with regard to the Allowed Remediation Claim, the insurance

proceeds will be divided and disbursed 50% to the Claimants, and 25% to each of the Consolidated SWINC Estate and the Consolidated SWE&C Estate until such time as the Claimants are paid an additional $5,000,000.00 (the "Additional Cash Payment"). Until the Additional Cash Payment is received by the Claimants, any settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim will be subject to approval by the Claimants, whose approval will not be unreasonably withheld. This Court shall retain jurisdiction to determine the reasonableness of any proposed settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim to the extent that the Claimants disapprove of any such settlement.

9. Notwithstanding any provision of the Settlement, the Settlement shall not constitute an admission of liability by the Debtors for any purpose other than consummation of the Settlement, and shall not constitute an admission of liability by the Debtors with respect to any sites other than the sixteen (16) sites that are the subject of the Allowed Remediation Claim.

No third-party beneficiaries are intended in the Settlement, and no party other than the Claimants is a beneficiary thereof. Other than the Claimants, no party may rely on any admission of liability by the Debtors in the Settlement for any purpose whatsoever. The approval of the Settlement by this Order does not constitute a finding of any liability by the Debtors for any purpose whatsoever.

10. It is not this Court's intention to cause the findings in paragraphs B and C of this Order to be given collateral estoppel, res judicata, or other claim or issue preclusion effects in any court presiding over any insurance coverage litigation. However, this Court makes no ruling as to the rights of any party in any insurance coverage litigation to contend that the findings in paragraphs B and C of this Order have collateral estoppel, res judicata, or other claim or issue preclusion effects, as well as the rights of any party in any insurance coverage litigation to contend that there are no such collateral estoppel, res judicata, or other claim or issue preclusion effects.

11. The rights of the Debtors' insurers to contest coverage for the Allowed Remediation Claim or any remediation claims related to the sites set forth in recitals D and E of the Settlement, as well as the Debtors' rights to assert that such insurers are obligated to provide such coverage, are fully preserved.

12. The rights, if any, of the Debtors' insurers to contend that the Debtors' are not jointly and severally liable to the Claimants for the payment of 66 and 2/3% of future response costs at the sites identified in recitals D and E of the Settlement, as well as the Debtors' right to contest such contention, are fully preserved.

13. All motions, objections and other pleadings identified in Recital J of the Settlement are hereby deemed withdrawn.

14. The failure of this order to include any provision of the Settlement shall not vitiate the validity or effect or such provision.

15. The rights of the Consolidated SWINC Estate, the Consolidated SWE&C Estate, and their successors regarding the allocation of the Allowed Remediation

Claim and the allocation of the insurance proceeds referred to in paragraph 8 of this Order between them are fully preserved.

Dated: Wilmington, Delaware
January 9, 2004

Honorable Peter J. Walsh
United States Bankruptcy Judge

# EXHIBIT A

# SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT (the "Agreement") by and between Stone & Webster, Incorporated and its subsidiaries and affiliates that are also debtors and debtors-in-possession in the Chapter 11 cases jointly administered under Case No. 00-02142(PJW) (the "Debtors") and Southern Union Company and its subsidiaries and affiliates ("Southern Union") and The Narragansett Electric Company and its subsidiaries and affiliates ("NEC"):

## RECITALS

A. On June 2, 2000 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code. On July 18, 2000, an order was entered establishing August 25, 2000 as the deadline for timely filing proofs of claim against the Debtors (the "Bar Date").

B. The Fall River Gas Company (f/k/a the "Fall River Gas Works Company" and collectively, "Fall River Gas") and the Blackstone Valley Gas & Electric Company ("BVG&E") were utility companies that operated manufactured gas plants ("MGP's) in Rhode Island and Massachusetts. Valley Gas Company ("Valley Gas") acquired the gas utility assets of BVG&E. In September 2000, Southern Union acquired Fall River Gas and Valley Gas. NEC acquired Blackstone Valley Electric Company in May 2000.

C. Environmental contamination exists or may exist at certain sites in Rhode Island and Massachusetts where Fall River Gas and BVG&E or others manufactured and stored gas and by-products of the MGP process and allegedly deposited such materials. These potentially contaminated sites are referred to in this Agreement as the "Fall River Sites" and the "BVG&E Sites."

D. The Fall River Sites consist of the following: (1) the Charles & Bay former MGP in Fall River, Massachusetts; (2) the 5th and Hartwell former MGP in Fall River, Massachusetts; (3) the Pond & Anawan former MGP in Fall River, Massachusetts; (4) the Roberson & Cherry former manufactured gas holder site in Fall River, Massachusetts; (5) the Turner & Davol former manufactured gas holder site in Fall River, Massachusetts; (6) the Cory's Lane / Andrade alleged disposal site in Tiverton, Rhode Island; (7) the Plympton former MGP in Plympton, Massachusetts; (8) the Plympton alleged disposal site in Plympton, Massachusetts; and (9) the Bay Street Neighborhood Study Area in Tiverton, Rhode Island.

E. The BVG&E Sites consist of the following: (1) the Tidewater former MGP in Pawtucket, Rhode Island; (2) the Hamlet Avenue former MGP in Woonsocket, Rhode Island; (3) the Pond Street former manufactured gas holder site in Woonsocket, Rhode Island; (4) the Exchange Street former manufactured gas holder site in Pawtucket, Rhode Island; (5) the Mendon Road alleged disposal site in Attleboro, Massachusetts;

(6) the Lawn Street alleged disposal site in Attleboro, Massachusetts; (7) the Cumberland alleged disposal site in Pawtucket, Rhode Island; and (8) the High Street former MGP in Central Falls, Rhode Island.

F. To date, NEC claims to have incurred $13,083,911.00 in costs of "response" (as defined for purposes of this Settlement Agreement, in the Comprehensive Environmental Response, Compensation and Liability Act, as amended) to actual and/or threatened releases of hazardous substances at or from the BVG&E Sites. To date, Southern Union claims to have incurred an additional $979,651.10 in costs of response to actual and/or threatened releases of hazardous substances at or from the BVG&E Sites. Investigation and remediation of the BVG&E Sites is ongoing. To date, Southern Union claims to have incurred $1,066,883.90 in costs of response to actual and/or threatened releases of hazardous substances at or from the Fall River Sites. Investigation and remediation of the Fall River Sites is ongoing.

G. NEC and Southern Union believe that BVG&E was under the management, operation and control of Stone & Webster, Incorporated ("SWINC"), Stone & Webster Engineering Corporation ("SWEC") and Stone & Webster Management Consultants ("SWMC") when the environmental contamination occurred at the BVG&E Sites. NEC and Southern Union further believe that these Debtors are jointly and severally liable for the response costs at the BVG&E Sites. NEC and Southern Union filed proofs of claim (respectively, the "NEC Claims" and the "Valley Gas Claims") against SWINC, SWEC and SWMC asserting that these Debtors are jointly and severally liable to them for indemnity against or contribution to all of their past and future response costs with respect to the BVG&E Sites. The NEC Claims are claim numbers 2548, 2457 and 4221. The Valley Gas Claims are claim numbers 2267, 2422 and 2438. Pursuant to a Bankruptcy Court order entered on December 13, 2000, Valley Gas Claim numbers 2422 and 2438 were expunged as being duplicative of Valley Gas Claim number 2267.

H. Southern Union believes that Fall River Gas was under the management, operation and control of SWINC, SWEC and SWMC when the environmental contamination occurred at the Fall River Sites. Southern Union further believes that these Debtors are jointly and severally liable for the response costs at the Fall River Sites. On May 20, 2003, Southern Union filed proofs of claim (the "Fall River Claims") against SWINC, SWEC and SWMC asserting that these Debtors are jointly and severally liable to it for indemnity against or contribution to all of its past and future response costs with respect to the Fall River Sites. The Fall River Claims are claim numbers 5424 through 5429.

I. The Debtors disputed that they managed, operated or controlled BVG&E or Fall River Gas, or that the Debtors are liable for any response costs relating to the Fall River Sites and the BVG&E Sites.

J. On September 16, 2003, the Debtors filed their Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4502) (the "Objection"). On October 1, 2003, the Official Committee of Unsecured Creditors (the "Creditors' Committee") filed a Limited Objection [] to Debtors' Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4561). On October 1, 2003, Southern Union filed its Reply and Response to Debtors' Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4562) (the "Response"). Also on October 1, 2003, NEC filed a Motion to Estimate Claims for Purposes of Voting and Establishing Reserves Under the Plan Pursuant to Fed. R. Bankr. P. 3018 and 3020 (Docket No. 4560) (the "NEC Motion"). On October 16, 2003, Southern Union filed its Motion to Deem Certain Proofs of Claim Timely Filed (Docket No. 4605) (the "Timeliness Motion") and its Motion to Reinstate Certain Expunged Proofs of Claim Pursuant to 11 U.S.C. § 502(j) and Fed. R. Bankr. P. 3008 and 9024 (Docket No. 4606) (the "Reinstatement Motion"). On October 20, 2003, Southern Union and NEC each filed objections to the confirmation of the Joint Plan (Docket Nos. 4622 and 4623) (the "Confirmation Objections"). The Creditors' Committee filed an objection to the Reinstatement Motion on October 22 (Docket No. 4634) and an objection to the Timeliness Motion on October 23 (Docket No. 4637). The Official Committee of Equity Security Holders (the "Equity Committee") filed a limited joinder in support of Southern Union's Reinstatement Motion on October 24 (Docket No. 4645). Additionally, the parties served multiple deposition notices in connection with the foregoing motions and objections. This Agreement resolves all of the foregoing motions and objections, without the need for any further discovery in connection thereto.

K. The Debtors, Southern Union and NEC each conclude that litigation of the above-described motions would be expensive and protracted and pose substantial risks and, therefore, make this Agreement to avoid the cost, risks and delay of continued litigation.

L. The Debtors, Southern Union and NEC each believe that this Agreement is in the best interest of the Debtors, the Consolidated SWINC Estate (which consolidated estate includes SWINC) and its creditors, the Consolidated SWE&C Estate (which consolidated estate includes SWEC and SWMC) and its creditors, the ratepayers of Southern Union, and the ratepayers of NEC.

**NOW, THEREFORE,** in consideration of the foregoing, the covenants and releases set forth below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

1. The Parties agree that the above Recitals are incorporated into the body of this Agreement and shall have the same force and effect as if set forth herein.

2. Upon the Parties execution of and Court approval of this Agreement, NEC and Southern Union (together, the "Claimants") will hold an allowed claim against the Debtors, the Consolidated SWINC Estate and the Consolidated SWE&C Estate of $15,000,000.00 for actual response costs incurred to date at the BVG&E Sites and the Fall River Sites (the "Allowed Remediation Claim"), which Allowed Remediation Claim shall be deemed to be a vote to accept the Joint Plan (as defined in paragraph 5 below) in Class 5A and Class 5B.

3. Upon the Parties execution of and Court approval of this Agreement, Valley Gas Claim numbers 2422 and 2438 will be reinstated and Fall River Claims numbers 5424 through 5429 will be deemed timely filed. In addition, the Allowed Remediation Claim will be an amendment to and consolidation of: (i) NEC Claim numbers 2548, 2457 and 4221; (ii) Valley Gas Claim numbers 2267, 2422 and 2438; and (iii) Fall River Claim number 5424 through 5429.

4. Upon the Court's entry of a final, non-appealable order approving this Agreement, all motions, objections and other pleadings, including those listed in Recital J, will be deemed withdrawn. Each movant and responding party will be responsible for taking appropriate steps to withdraw such pleadings from the Court's docket.

5. On the Effective Date and in accordance with the provisions of the Third Amended Joint Plan of Reorganization of the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone and Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone and Webster Engineers & Constructors, Inc. and Certain of its Subsidiaries and Affiliates (the "Joint Plan"), the Claimants will receive a cash distribution of $5,000,000.00 (the "Cash Payment") in payment of the Allowed Remediation Claim. Except as set forth in paragraphs 6 and 7 of this Agreement, the Cash Payment will constitute the only consideration to be paid or payment to be made by the Debtors, the Consolidated SWINC Estate, the Consolidated SWE&C Estate, or their successors with respect to all past, present and/or future claims held or asserted, or which could have been asserted, by the Claimants against the Debtors, the Consolidated SWINC Estate, the Consolidated SWE&C Estate, or their successors.

6. The Debtors shall use reasonable efforts to obtain recovery from their primary insurers. To the extent the Debtors, through settlement or otherwise, recover any payments from their primary insurers with regard to the Allowed Remediation Claim, the insurance proceeds will be divided and disbursed 50% to the Debtors and 50% to the Claimants until such time as the Claimants are paid an additional $5,000,000.00 (the "Additional Cash Payment"). Until the Additional Cash Payment is received by the Claimants, any settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim will be subject to approval by the Claimants, whose approval will not be unreasonably withheld. The Bankruptcy Court will retain

jurisdiction to determine the reasonableness of any proposed settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim to the extent that the Claimants disapprove of any such proposed settlement.

7. With respect to any of the remediation claims related to the sites set forth in Recitals "D" and "E" herein by the Claimants against the Debtors, the Debtors are jointly and severally liable to the Claimants for the payment of 66-2/3% of all future response costs at the BVG&E Sites and the Fall River Sites. However, any such future response costs will be collectible by the Claimants only from proceeds of Debtors' excess insurance, and not from any funds of the Debtors or their successor entities. The maximum amount that the Debtors' estates will pay under this agreement is the Cash Payment. This paragraph does not apply to any bodily injury claims brought against the Debtors that are related to the BVG&E and Fall River Sites. This agreement: (i) has no effect with respect to the allocation of the Allowed Remediation Claim among the Debtors' estates, and the rights of the Consolidated SWINC Estate, the Consolidated SWE&C Estate, and their successors to litigate the issue of such allocation are preserved, and (ii) does not constitute a finding or admission of liability with respect to any bodily injury claims brought against the Debtors.

8. On the Effective Date of the Joint Plan, the Debtors will assign jointly to the Claimants the right to control assertion and settlement of claims and the right to receive any proceeds from any of the Debtors insurance policies (other than the Debtors' primary insurance policies) with respect to losses, liabilities and expenses relating to the remediation of the BVG&E Sites and the Fall River Sites, and the Debtors will cooperate in good faith with the Claimants in providing copies of the applicable policies, and secondary evidence of the existence and terms of such policies.

9. Upon execution of this Agreement, or as soon thereafter as is reasonably practicable, Claimants shall provide Debtors with information regarding losses, liabilities and costs related to the BVG&E Sites and the Fall River Sites (the "Sites"), including but not limited to non-privileged: (i) environmental studies conducted on the Sites, (ii) reports of remediation activities, (iii) correspondence with state, local and national environmental agencies regarding the investigation and remediation of the Sites, (iv) invoices/bills documenting past expenditures at the Sites, (v) estimates of potential future costs at the Sites, (vi) orders or directives by governmental entities, and (vii) claims made by other third parties with regard to or related to the Sites. In addition, Claimants will cooperate in good faith with Debtors in their efforts to obtain insurance coverage for the Sites. Debtors will cooperate in good faith with Claimants in their efforts to obtain insurance coverage for the Sites.

10. This Agreement does not affect Debtors' rights to pursue and/or obtain recovery from any and all of its insurers for any bodily injury claims brought against the Debtors related to the BVG&E Sites and the Fall River Sites or otherwise. This Agreement does not affect Claimants' rights, if any, to pursue and/or obtain recovery

from any and all of Debtors' insurers for any bodily injury claims related to the BVG&E Sites and the Fall River Sites or otherwise. Furthermore, nothing in this Agreement or in the Joint Plan will affect or impair the rights of Southern Union or NEC to take direct actions to recover under policies of insurance where Southern Union or NEC is a "co-insured" or "additional insured" with one of the Debtors.

11. This Agreement may be executed in multiple counterpart originals, each of which will constitute one and the same document and will be deemed an original. This Agreement may be executed by facsimile signatures, which will be deemed to have the same force and effect as an original signature.

12. This Agreement represents a final and complete expression of the understandings between the Parties and this Agreement may not be contradicted by evidence of any prior oral agreement or of a contemporaneous oral agreement or understanding between the Parties. There are no promises, terms, conditions or obligations other than those contained in this Agreement.

13. The Parties represent and warrant that they have read and thoroughly understand the terms and conditions of this Agreement.

14. This Agreement will be binding upon and inure to the benefit of the Parties and their respective heirs, representatives, successors and assigns, including, but not limited to, the Reorganized SWINC, the SWINC Plan Administrator and the SWE&C Liquidating Trust.

15. No amendments to this Agreement shall be effective unless such amendment is in writing and signed by all Parties hereto.

16. Whenever possible, each provision of this Agreement will be interpreted to be effective and valid under applicable law. If any provision of this Agreement is held to be prohibited by or invalid under applicable law, the provision will be ineffective only to the extent of the prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this Agreement.

17. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware.

18. Each Party is to bear its own fees, costs, and expenses in this matter.

19. The Parties hereby agree to execute from time to time all documents that may be necessary or desirable to carry out the terms of this Agreement, or to affect the purpose of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement this ______ day of November 2003.

STONE AND WEBSTER, INCORPORATED, ET AL

______________________________

James P. Carroll
President and Chief Restructuring Officer
44 Milk Street
Boston, MA 02109

SOUTHERN UNION

______________________________

Dennis K. Morgan, Esq.
Executive Vice President – Administration,
General Counsel and Secretary
One PEI Center
535 East Northampton Street
Wilkes Barre, PA 18711

THE NARRAGANSETT ELECTRIC COMPANY

______________________________

John F. Sherman, III
Deputy General Counsel
25 Research Drive
Westboro, MA 01582