UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| GAIL, JOHN D. AND JOHN F. CORVELLO, et al.<br><br>vs.<br><br>NEW ENGLAND GAS COMPANY, INC.,<br><br>vs.<br><br>BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC, et al. | C.A. No. 05-0221T (Lead Case)<br>(Related and Consolidated Cases: 05-274T; 05-370T; 05-522T) |

## DEFENDANT NEW ENGLAND GAS COMPANY'S PRETRIAL MEMORANDUM

Defendant New England Gas Company ("NEGC") submits this pretrial memorandum in accordance with the Court's Pretrial Order – Jury Case.[1]

## FACTS

The development history of the Bay Street Area ("BSA") is crucial to this case. The neighborhood was developed, and homes were built, over a period that spanned the better part of the last one hundred years. This area is low lying and marshy, meaning that it could not sustain development without changes being made to the landscape and without substantial fill being brought in to raise the grade. The historical evidence and testimony shows that various developers, *and many of the Plaintiffs themselves*, brought fill from outside the neighborhood onto their land to develop these properties. The development and fill occurred not only over a long period of time, but consisted of a significant volume of material. Historically, fill often

[1] This pretrial memorandum applies to the above-captioned case as well as the consolidated cases of *Kevin Burns, et al. v. New England Gas Co.* (C.A. No. 05-274T), *Sheila Reis, et al. v. Southern Union Co.* (C.A. No. 05-522T), and *Colleen Bigelow, et al. v. New England Gas Co.* (C.A. No. 05-370T).

introduced waste and contaminants into an area. Developers do not use expensive farm loam to raise grades or fill low lying areas; they use fill from a variety of lesser quality sources.

Some of the fill used by the developers and homeowners contained scattered and moderately elevated levels of contaminants. There is no evidence that Fall River Gas Company ("FRGC") was involved in the development of this area. Developers and owners brought fill into the BSA long after FRGC's Charles Street facility stopped manufacturing gas.

Further, the facts demonstrate that in the 1930s the Town purchased cinders, coal ash and other materials from third parties and hired contractors to use these materials to build the roads in the BSA. The Town also purchased oils and Tarvia – a coal tar product – to coat and cover the roads throughout the BSA, and indeed throughout the Town. Many of these materials that the Town placed in the BSA are the same types of materials that the plaintiffs try to attribute to FRGC. These roads are the single biggest source of contamination in the BSA.

The limited, and non-hazardous contamination in the soil on some of Plaintiffs' properties is heterogeneous, scattered, and largely consistent with both natural and anthropogenic background sources. For example, although arsenic is one of the most common constituents affecting some of the Plaintiffs' properties, the arsenic is unrelated to MGP residuals. Plaintiffs' expert, Dr. Suuberg, acknowledged that many coals produced no arsenic in the MGP process, and others resulted in only trace levels in ash. The arsenic in the BSA derives from many sources. For example, arsenic can be attributable to: (1) background levels in the Aquidneck Island area that commonly exceed the "safe" levels set by the State, and (2) lead arsenate that was the most common herbicide and insecticide used in local farms in the first half of the 1900s. The BSA had substantial farming over the past 100 years. The wide presence of arsenic in the

BSA is a substantial barrier to Plaintiffs' claims as its presence proves contaminants from non-MGP sources.

Similarly, lead — another common constituent detected in the BSA — is not associated with MGP waste. While Dr. Suuberg initially speculated that the lead in the BSA could have come from lead paint chips from the FRGC facility, when pressed he admitted that he had no evidence that this occurred. Indeed, there were dozens of homes in the BSA painted with lead paint before 1978, and farms that used lead-arsenate. The presence of lead, like arsenic, is another barrier to Plaintiffs' claims, because it proves non-MGP sources.

Plaintiffs also contend that polycyclic aromatic hydrocarbons (PAHs) are a marker for MGP waste, but most of the PAH levels are within urban background levels — in other words, the same levels appear in properties throughout Rhode Island and Massachusetts.[2] In fact, Dr. Suuberg testified that PAHs are ubiquitous in our environment as they are a product of virtually every form of combustion, including oil or gas heat, propane and charcoal grills, cars, gas ranges, and industrial facilities of all kinds. Against this backdrop of ubiquitous PAH levels, the levels of PAHs found in the BSA are not typical of the high concentrations routinely associated with MGP tar. That is, although one should expect to find PAHs throughout Rhode Island, one would expect to find exceptionally high levels at an MGP waste site. That is not the case, though; and the absence of those uniformly high levels demonstrates the absence of MGP wastes.

Finally, there is an absence of meaningful physical evidence of MGP waste. Plaintiffs can not point to large caches of box waste, or wood chips, or ash, or coal tar. Lacking the telltale markers, Plaintiffs instead point to bricks, concrete, ash, ceramics, glass, wire, coal, and clinkers. These materials, however, are hardly unique to or indicative of MGP facilities.

[2] Those PAHs are also attributable to the third party defendants.

Also fundamental to this analysis is the history of the FRGC. The byproducts produced by the FRGC manufactured gas plant were produced, sold, recycled, or disposed of for decades prior to 1953. No witness will testify that FRGC operated its facility in an unreasonable manner. The significant lack of evidence supporting Plaintiffs' claims also applies to the FRGC facility. FRGC's business records consistently show that on a limited number of occasions FRGC paid a local business to haul its ash and, rarely its box waste, to the dump. The independent contractor hired to remove the waste was Simpson Contracting, a company run by a prominent local business man, who was also a member of the Tiverton Town Council, a state senator, and a person experienced in the construction, hauling, and disposal business.

Plaintiffs do not dispute that FRGC hired a responsible contractor. Rather, Plaintiffs argue that if Simpson did not dispose of waste at the dump, but rather sold certain waste (ash or cinders) as fill to the Town and others, that FRGC would be liable for such actions on a theory of non-delegable duty. Plaintiffs are wrong.

**<u>NEGC'S DEFENSES</u>**

NEGC has raised the following defenses in this lawsuit:

1. Plaintiffs' claims are barred by the applicable statute of limitations, laches, waiver, estoppel and/or unclean hands.

2. Plaintiffs lack standing to bring the claims asserted in the Complaint, and alternatively, plaintiffs failed to file suit in the correct legal capacity and/or with the required authorization and procedure.

3. Plaintiffs' claims are barred in whole or in part by plaintiffs' assumption of risk, including without limitation, because plaintiffs, or their predecessors in interest or their agents, had knowledge of and accepted and assumed the hazards and risks which caused, contributed to or resulted in their alleged damages.

4. Plaintiffs have failed, refused and/or neglected to mitigate their damages alleged in the Complaint, and alternatively, plaintiffs have by their own acts and omissions increased their claimed damages.

5. If the plaintiffs suffered any damage or loss, which NEGC denies, such damage or loss was not caused by, or legally attributable to, NEGC.

6. Plaintiffs' claims are barred, in whole or in part, because none of the alleged acts or omissions by NEGC were the proximate cause or the actual cause of the injuries or damages allegedly sustained by plaintiffs, and, alternatively, because any injuries or damages allegedly sustained by plaintiffs were the result of intervening or superseding events, factors, occurrences or conditions not proximately caused by NEGC and for which NEGC is not liable.

7. Plaintiffs' alleged injuries are the fault of persons or entities other than NEGC, and for whose conduct NEGC is not responsible, and such claims are therefore barred against NEGC, or, in the alternative, such fault of persons or entities other than NEGC reduces plaintiffs' right of recovery by that amount which said fault of other persons or entities contributed to plaintiffs' alleged damages.

8. Plaintiffs' claims premised on theories of agency are barred against NEGC because no employee, "servant" or agent of NEGC was authorized by NEGC to commit the relevant acts alleged in the Complaint.

9. Plaintiffs' claims against NEGC are barred because, even assuming the occurrence complained of involved any NEGC by-products, the by-products were handled and disposed of in compliance with then applicable: (a) customs, codes, practices, "state of the art" and/or technology of the trade and industry; and, alternatively, (b) laws and regulations.

10. Plaintiffs' claims are barred against NEGC because, even assuming the occurrence complained of involved any NEGC by-products, the by-products were supplied to a party that was knowledgeable, experienced and/or sophisticated with regard to the properties, potential hazards and manner of safe handling of such products.

11. At all times relevant hereto, NEGC complied with all then applicable laws and regulations, and the claims asserted by the plaintiffs are, therefore, barred and/or preempted under state or federal law, or both.

12. At all relevant times, defendants acted with due care, complied with all applicable laws and regulations, and otherwise conducted themselves reasonably under the circumstances.

13. Plaintiffs are not entitled to recover the types of damages, or the declaratory and injunctive relief, sought in the Complaint.

14. Plaintiffs' claims for nuisance are barred in whole or in part by the doctrine of prescription.

15. Plaintiffs' claims are barred in whole or in part on the basis that the acts complained of were performed gratuitously, for public benefit and/or as a "Good Samaritan."

16. Plaintiffs' punitive damages claim is barred as a matter of law and public policy, and cannot be sustained because Plaintiffs cannot meet the exacting standard required for the

imposition of punitive damages under Rhode Island law and additionally because such an award would violate NEGC's due process, equal protection, and other rights guaranteed by law, and by the Constitution of the State of Rhode Island and the United States Constitution.

17. The complaint, and each cause of action therein, is barred on the basis that one or more governmental entities, including the Town of Tiverton, contracted for and/or sought the deposit of the materials which are alleged to have caused plaintiffs' injuries and damages.

18. The complaint, and each cause of action therein, is barred on the basis that, as a matter of contract and/or operation of law, plaintiffs waived or otherwise relinquished their claims in connection with their purchase of their properties.

19. To the extent plaintiffs suffered any damage, such damage was caused by the "moratorium" imposed by the Town of Tiverton, and therefore, plaintiffs have no claim and can recover no damages from NEGC by reason of such governmental action.

20. Plaintiffs' claims are barred because any alleged dangers claimed were open and obvious at all relevant times.

21. Plaintiffs' claims are barred in whole or in part by R.I. Gen. Laws § 9-1-29.

22. Plaintiffs' claims are barred in whole or in part because one or more governmental entities, including without limitation, the Rhode Island Department of Environmental Management and the Town of Tiverton, approved the development of plaintiffs' properties for residential improvement and development with actual or constructive knowledge of the conditions of which plaintiffs now complain.

## **<u>FACTUAL AND LEGAL ISSUES</u>**

The key factual and legal issues are set forth below:

1. Are Plaintiffs' claims barred by the statute of limitations?

2. Does NEGC's predecessor, FRGC, owe a negligence duty of care to Plaintiffs and, if so, was there a breach and did that breach proximately cause Plaintiffs' injuries?

3. Did FRGC knowingly engage in abnormally dangerous activities or cause an abnormally dangerous condition to exist and, if so, could the risks therefrom be limited by the exercise of reasonable care?

4. Did FRGC cause or substantially contribute to a public nuisance and did NEGC unreasonably interfere with a right common to the general public and did Plaintiffs sustain "special damages" as a result of the interference?

5. Can Plaintiffs show that they have suffered individual compensable damages as a result of any act of omission of FRGC?[3]

6. Did FRGC engage in conduct of such willfulness, recklessness or wickedness as amounts to criminality warranting an award of punitive damages?[4]

## ARGUMENTS

Plaintiffs' remaining claims consist of negligence, strict liability, and public nuisance.

### I. PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

All of plaintiffs' claims are barred by Rhode Island's ten-year statute of limitations. R.I. Gen. Laws § 9-1-13(a). In Rhode Island, the general rule is that a cause of action accrues at the time of injury. *Anthony v. Abbott Lab.*, 490 A.2d 43, 45 (R.I. 1985).[5] Here, the alleged injury occurred many decades ago. The statute of limitations began to run for all of plaintiffs' claims when material from FRGC was allegedly disposed of -- primarily in the 1930's, but certainly by 1970 at the latest. (Corvello Second Amended Compl. at ¶¶ 16, 17; Reis Amended Compl. at ¶¶ 28, 30). *New York v. Moulds Holding Corp.*, 196 F. Supp.2d 210, 220 (N.D.N.Y. 2002) (holding that the statute of limitations began to run for public nuisance claim when corporation had allegedly dumped hazardous wastes and damaged land, and claim was therefore time barred three years later).

Plaintiffs cannot save their claim by reliance on a "discovery rule." The Rhode Island Supreme Court has confined the discovery rule to claims involving medical malpractice, drug product liability and improvements to real estate. *Mills v. Para-Chem*, CA 04-393S, 2005 U.S.

---

[3] NEGC has moved for summary judgment with respect to those Plaintiffs who have no evidence of any contamination on their properties. That motion is *sub judice*. NEGC reserves the right to address any further damages or remediation issues as they may arise and as they may be asserted in Phase II of the trial in the event there is a liability determination. See also part V, *infra*.

[4] Plaintiffs' claims for punitive damages are the subject of NEGC's motion for partial summary judgment, which is also *sub judice*. The deficiencies in the punitive damages claim will not be restated herein.

[5] Copies of legal authorities cited in the Pretrial Memorandum will be delivered separately to the Court.

Dist. LEXIS 8202, at *11-12 (D.R.I. April 11, 2005); *see also Hill v. Rhode Island State Employees Ret. Bd.*, 935 A.2d 608, 616 (R.I. 2007) (noting that the discovery rule has been applied in certain limited contexts); *Martin v. Howard*, 784 A.2d 291, 299 (R.I. 2001) (same); *Lee v. Morin*, 469 A.2d 358, 360 (R.I. 1983) (applying discovery rule to claim involving construction of a house). The Rhode Island Supreme Court has never adopted a discovery rule that is applicable to the claims in this case. This Court should not, in a diversity case, create new law that eliminates the repose provided by the statute of limitations.

## II. PLAINTIFFS' NEGLIGENCE CLAIM LACKS MERIT

In order to prove negligence under Rhode Island law, Plaintiffs must show: 1) NEGC owed them a legal duty to refrain from negligent activities; 2) NEGC breached that duty; 3) the breach proximately caused Plaintiff's injuries; and 4) actual loss or damages resulted. *Gray v. Derderian*, 365 F. Supp. 2d 218, 226 (D.R.I. 2005) (citing *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 466 (R.I. 1996); *Liu v. Striuli*, 36 F.Supp.2d 452, 466 (D.R.I. 1999)). None of these elements are present in this case.

### A. There Was No Duty Running From NEGC To Plaintiffs

"Every negligence case begins with a consideration of whether a legally cognizable duty runs from the defendant to the plaintiff." *Kenney Mfg. Co. v. Starkweather & Shepley, Inc.*, 643 A.2d 203, 206 (R.I. 1994). Whether such a duty exists is a question of law to be determined by the court. *Hydro-Mfg., Inc. v. Kayser-Roth Corp.*, 640 A.2d 950, 955 (R.I. 1994). The Rhode Island Supreme Court has articulated several factors to be considered in answering this question. *See Banks v. Bowen's Landing Corp.*, 522 A.2d 1222, 1225 (R.I. 1987). These factors include:

1. the foreseeability of harm to the plaintiff;

2. the degree of certainty that the plaintiff suffered an injury;

3. the closeness of connection between the defendant's conduct and the injury suffered;

4. the policy of preventing future harm, and

5. the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach.

*Id*. No duty exists in this case[6] pursuant to the Independent Contractor Doctrine and because it was not foreseeable that Plaintiffs would be injured by NEGC's activities.

1. The Independent Contractor Rule Precludes The Existence Of A Duty In This Case

"The general rule is that one who employs an independent contractor is not liable for the negligent acts of that contractor." *East Coast Collision & Restoration, Inc. v. Allyn*, 742 A.2d 273 (R.I. 1999); *see also Konar v. PFL Life Ins. Co.*, 840 A.2d 1115, 1117 (R.I. 2004); *see also* Restatement (Second) Torts, § 409 (1965). By contracting with a responsible third-party, the employer in essence shifts the duties associated with the subject of the contract to the contractor. The status of "independent contractor" is conferred upon a person "who is hired to perform a task according to his or her own skill and judgment and is not subject to the employer's control." *Fraioli v. Lemcke*, 328 F.Supp.2d 250, 270 (D.R.I. 2004). The key element distinguishing an independent contractor from an employee is "the right of the principal to control the work of the agent." *Butler v. McDonald's Corp.*, 110 F.Supp.2d 62, 65 (D.R.I. 2000); *Toledo v. Van Waters*

[6] In its previous decision on NEGC's Motion to Dismiss, the Court held that Plaintiffs stated a claim for negligence in light of the duty "to refrain from conduct that contaminates or otherwise harms neighboring properties." *Corvello v. New England Gas Co.*, 460 F. Supp. 2d 314, 320-21 (D.R.I. 2006). This duty is insufficient for trial purposes, however, because the evidence adduced through discovery reveals that Plaintiffs did not own property neighboring or even in the vicinity of any facilities of NEGC's predecessor.

*& Rogers, Inc.*, 92 F.Supp.2d 44, 53 (D.R.I. 2000). As will be demonstrated at trial, the waste haulers hired by NEGC's predecessors were completely independent third parties and NEGC's predecessors did not control their work or determine the means of disposal of MGP waste.

2. Injury to Plaintiffs Was Not Foreseeable

The foreseeability of harm to the plaintiff is arguably the most straightforward and important of all the factors to be considered when examining the issue of whether a duty exists. *See Bowen's Landing Corp.*, 522 A.2d at 1225 ("Underlying the amorphous term "duty" is the legal concept of forseeability."). In cases where injury to the plaintiff resulting from defendant's activities is not foreseeable, the Rhode Island Supreme Court will not recognize a legal duty incumbent upon the defendant. *See Builders Specialty Co. v. Goulet*, 639 A.2d 59 (R.I. 1994).

Here, it was not foreseeable that the actions of the predecessors of NEGC would injure Plaintiffs. The chain of random events that lies between the manufacture of gas in the first half of the 1900's and the discovery of contamination in the early 2000's could not have been predicted. When FRGC hired qualified disposal contractors to remove its manufacturing waste to a dump, it could not have foreseen that the contractor would take some of the waste to the BSA and sell it to various parties who used it as fill.

3. NEGC's Predecessor Did Not Breach Any Duty Of Care That Could Be Deemed To Exist

Even if FRGC had a duty to Plaintiffs, there is no evidence to suggest that it breached that duty. At trial, it will be established that NEGC exercised due care with respect to its MGP operations and the disposal of its MGP waste by hiring an appropriate disposal contractor.

B. NEGC Is not Responsible for The Intervening Acts of Third Parties that led to Plaintiffs' Alleged Injuries

"Where the negligence of a responsible third party intervenes between original negligence of the defendant and the plaintiff's injury, the causal connection between the latter two may be broken and the act of the third party may be the proximate cause of the injury." *Floyd v. Turgeon*, 27 A.2d 330 (R.I. 1942). The key is foreseeability; if the intervening act could not have been foreseen, the original act will not be actionable. *See Denisewich v. Pappas*, 198 A.2d 144, 148 (R.I. 1964); *Sroka v. Halliday*, 103 A. 799, 800 (R.I. 1918); *Mahogany v. Ward*, 17 A. 860, 881 (R.I. 1889). If the plaintiffs prove that Simpson or others placed waste from FRGC in the BSA, FRGC is not responsible for those actions.

Courts have recognized that subsequent intervening acts may relieve manufacturers of hazardous substances from liability for environmental contamination. *See Traube v. Fruend*, 775 N.E.2d 212 (Ill. Ct. App. 2002); *Adams v. A.J. Ballard Jr. Tier & Oil Co.*, 2006 WL 1875965 (N.C. Super. June 30, 2006). In *Traube v. Fruend*, 775 N.E.2d 212, 216 (Ill. Ct. App. 2002), a pesticide manufacturer was held not to be liable for contamination of a lake that resulted from rainwater runoff from its customer's field. The court reasoned that the manufacturer could not be negligent because it did not control the product at the time it was applied. The customer's use of the pesticide and the rain were both intervening acts that broke any causal link between the manufacturer's conduct and the injury to plaintiff.

Similarly, in *Adams* the court considered whether gasoline refiners could be held liable for releases of methyl tertiary-butyl ether (more commonly known as MBTE) from underground storage tanks ("UST's). Although the court recognized that the refiners were responsible for creating the product that caused the contamination and adding the contaminant of concern to that product, it recognized that the release of contaminants would not have occurred but for the

intervening negligence of the UST owners and operators. *Adams*, 2006 WL 1875965, at *17. As a result of this intervening negligence, the court dismissed the negligence claims asserted against the refiners. *Id.*

In reaching its decision, the *Adams* court rejected the plaintiffs' argument that leaky USTs and operator negligence were foreseeable by the refiners. *Id.* at *18. Its holding in that regard is particularly instructive here:

> Plaintiffs seek to avoid the fundamental requirement of proximate causation by urging the court to adopt a theory of causation based upon a remarkably loose definition of foreseeability. Under this theory, all refiners of gasoline would be liable for ground and ground water contamination because they have sold a product that contaminates when leaked or spilled with knowledge that some USTs are improperly maintained by service station operators and that some operators would be careless and spill the gasoline. It is undeniable that old and leaking USTs pose a problem in this country and that gasoline will be carelessly spilled at times. However, Plaintiffs' theory would open a Pandora's box of litigation over the negligence of others based on a mere scintilla of foreseeability. Clearly, tank owner/operator negligence is a foreseeable possibility, but that fact alone doesn't mean that a refiner of ordinary prudence could foresee that a given owner/operator's negligence is *probable.*

*Id.* It was no more probable that the waste haulers hired by NEGC would negligently dispose of MGP waste in this case than that UST owners would negligently release gasoline in the *Adams* case.

## III. <u>PLAINTIFFS' STRICT LIABILITY CLAIM LACKS ANY MERIT</u>

Under Rhode Island law, a defendant who knowingly engages in abnormally dangerous activities or causes an abnormally dangerous condition to exist may be held liable for any resulting harm to persons or property even if the defendant exercised reasonable care. *Corvello v. New England Gas Co.*, 460 F. Supp.2d 314, 321 (D.R.I. 2006) (relying on Restatement (Second) of Torts § 519(1) (1977)). The focus is on ultra-hazardous or abnormally dangerous *activities* and not ultra-hazardous or abnormally dangerous *materials*. *Splendorio v. Bilray*

*Demolition Co.*, 682 A.2d 461, 465-66 (R.I. 1996). As this Court noted, "[t]he mere fact that an activity involves an ultra-hazardous or abnormally dangerous substance is not, by itself, sufficient to trigger strict liability." *Corvello*, 460 F. Supp.2d at 322. "'[I]f the rule were otherwise, virtually any commercial activity involving substances which are dangerous in the abstract automatically would be deemed as abnormally dangerous. This result would be intolerable.'" *Id*. (quoting *Splendorio*, 682 A.2d at 466). "Generally, '[a]n activity is not abnormally dangerous if the risks therefrom could be limited by the exercise of reasonable care.'" *Id*. *See Toledo v. Van Waters & Rogers, Inc.*, 92 F. Supp.2d 44, 56 (D.R.I. 2000) ("courts have focused on whether the risk involved could be reduced through the exercise of reasonable care").

Based on the forgoing principles and the undisputed record, plaintiffs' strict liability claims fail. Before the advent of natural gas as a fuel source, FRGC, a regulated Massachusetts public utility, provided manufactured gas to its customers. As alleged by plaintiffs, the "activity" in question is the disposal of waste from FRGC's manufactured gas process. (Corvello Second Amended Complaint at ¶¶ 1, 16, 17; Reis Amended Complaint at ¶ 1, 28, 30.) Plaintiffs' manufactured gas plant historian and expert witness, Eric Suuberg, testified that consistent with the practice reflected in FRGC's historical records, manufactured gas plants throughout the country routinely and customarily disposed of byproducts of the manufactured gas process which had little or no commercial value by either selling those materials as fill or having that material deposited in dumps. Thus, by plaintiffs' own admission, there is no dispute that the placement of such waste in dumps was an appropriate means of disposing of such waste. Accordingly, the risks associated with this waste could be limited by the exercise of reasonable care – through the safe disposal of such wastes in a dump.

A case on point, which this Court relied upon, is *Splendorio*, where the Rhode Island Supreme Court upheld the entry of summary judgment in favor of a company hired to develop an abatement plan for any asbestos found in buildings being demolished. The plaintiffs claimed that asbestos in the debris removed from the site contaminated their property and that the defendant, as the architect of the plan, was strictly liable. However, the Rhode Island Supreme Court ruled that, even though asbestos may be an abnormally dangerous substance, strict liability did not apply because the task performed by the defendant was not inherently dangerous and its "value to the community . . . far outweighed its dangerous attributes." *Splendorio*, 682 A.2d at 466. Here, too, there can be no dispute that the disposal of byproducts of FRGC's manufactured gas plant operations could be safely accomplished and was not abnormally dangerous.[7] The risks, particularly compared to the societal benefit of producing energy, could, and were, limited by the exercise of reasonable care -- here, contracting with a hauler to dispose of the waste material in a dump. *See Toledo,* 92 F. Supp.2d at 55-57 (under Rhode Island law, the transportation of barrels containing nitric and sulfuric acid was not in and of itself abnormally dangerous so as to warrant strict liability because such activity is routinely performed safely when parties exercise reasonable care).

No Rhode Island court has ever held that the disposal of hazardous waste is an abnormally dangerous activity warranting the imposition of strict liability. Other courts have specifically held that such an activity is *not* abnormally dangerous. For example, in *Bernbach v. Timex Corp.*, 989 F. Supp. 403, 407 (D. Conn. 1996), the court dismissed, for failure to state a cause of action, strict liability claims based on soil and groundwater contamination resulting

[7] The burden of coming forward with facts sufficient to support a theory of strict liability based on abnormally dangerous activities rests with the proponent of the claim. *Fletcher v. Conoco Pipe Line Co.*, 129 F. Supp.2d 1255, 1260 (W.D. Mo. 2001).

from a manufacturing facility's disposal of various hazardous substances, where plaintiffs failed to allege "circumstances and conditions in [defendant's] activities such that, irrespective of due care, the activities involve a risk of probable injury to such a degree that [they] fairly can be said to be intrinsically dangerous." (internal quotations omitted). *See also Schwartzman, Inc. v. Gen. Elec. Co.*, 848 F. Supp. 942, 945 (D.N.M. 1993) (granting motion to dismiss strict liability claim based on disposal of petroleum products and other hazardous wastes; despite the fact that such materials "may present a substantial degree of risk to persons or property when mishandled," the court held that "the risks can be eliminated through the exercise of reasonable care"); *Marmo v. IBP, Inc.*, 362 F. Supp.2d 1129, 1134 (D. Neb. 2005) (operation of a wastewater treatment facility generating hydrogen sulfide was not an abnormally dangerous activity because the risk of harm associated with its emissions could be controlled with due care); *Fletcher v. Conoco Pipe Line Co.*, 129 F. Supp.2d 1255, 1261 (W.D. Mo. 2001) (dismissing strict liability claim where neither the operation of a petroleum pipeline nor the use of cathodic protection was an abnormally dangerous activity as a matter of law because they are activities that can be performed safely); *Arlington Forest Assoc. v. Exxon Corp.*, 774 F. Supp. 387, 390 (E.D. Va. 1991) (storage and removal of gasoline in underground tanks not abnormally dangerous because it could be made safe through the exercise of reasonable care).

Accordingly, the disposal of waste from a manufactured gas plant facility is not an abnormally dangerous activity because the risks could be limited by the exercise of reasonable care.

## IV. PLAINTIFFS' PUBLIC NUISANCE CLAIM LACKS MERIT

In order to prevail on their public nuisance claim under Rhode Island law, plaintiffs must establish that FRGC unreasonably interfered with a "right common to the general public" and

that they sustained "special damages" as a result of the interference. *Corvello*, 460 F. Supp.2d at 324. "A right 'common to the general public' is a collective right that is shared by everyone in the community." *Id*. at 324. "It differs from a right that is possessed only by certain individual members of the public." *Id*. "[T]he fact that a condition interferes with the private rights of a substantial number of individuals does not, by itself, make it a public nuisance." *Id*. As this Court noted, the distinction is illustrated by Prosser's example of a polluted stream: "The pollution would be a private nuisance if it interferes only with the use and enjoyment of property belonging to a number of riparian owners but it would be a public nuisance if it kills all of the fish, thereby depriving the public of the right to fish in the stream." *Id*. at 324-25 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 90, at 645 (5th ed. 1984)). Thus, a public nuisance is something that substantially and unreasonably interferes with the use of a public place or the activities of an entire community. Plaintiffs cannot meet this standard for several independent reasons.

A. There Has Been No Interference With A <u>Right Common To The General Public</u>

First, FRGC did not interfere with a right common to the general public. Plaintiffs do not allege any interference with rights common to the general public such as the right to fish in a stream or to use the public roads, which is an essential element of any public nuisance claim. *Iafrate v. Ramsden*, 190 A.2d 473, 476-77 (R.I. 1963). Though plaintiffs allege in passing that contaminated fill may have been deposited under certain of Tiverton's roads, plaintiffs do *not* claim any limitation in their use of the public roads, nor do they claim any special damages arising from any such limitation in such use. Rather, plaintiffs seek relief only for the impact of

soil contamination on *their own properties*.[8] (Corvello Second Amended Complaint at ¶¶ 1, 2, 16, 17; Reis Amended Complaint at ¶¶ 1, 3-9, 28, 30.) Accordingly, plaintiffs have no claim for public nuisance in this case. *Iafrate*, 190 A.2d at 476-77. *See Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 316 (3d Cir. 1985) (overturning jury verdict and dismissing public nuisance claim where the property owner was not harmed "in any way by the pollution of [the] waters" but "specially harmed only in the exercise of its private property rights"); *Jersey City Redevel. Auth. v. PPG Indus.*, 665 F. Supp. 1257, 1265-66 (D.N.J. 1987) (dismissing on summary judgment property owners' public nuisance claim for contaminated fill, finding that the presence of the fill on their land was not "damages suffered in the exercise of a right common to the general public"; "[i]n order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public *exercising the right common to the general public that was the subject of the interference*") (citing Restatement (Second) of Torts § 821(C)(1))(emphasis in original); *Hanlin Group, Inc. v. Int'l Minerals & Chem. Corp.*, 759 F. Supp. 925, 936 (D. Me. 1990) (granting summary judgment dismissing public nuisance claim). For this reason alone, plaintiffs' public nuisance claim should be dismissed.

Second, there is no claim for public nuisance where the alleged impact is only to a subset of privately owned properties in a limited geographic area. As this Court noted, "the fact that a condition interferes with the private rights of a substantial number of individuals does not, by itself, make it a public nuisance." *Corvello*, 460 F. Supp.2d at 324 (citing *Iafrate v. Ramsden*, 96 R.I. 216, 222, 190 A.2d 473 (R.I. 1963)). In *Iafrate*, the Rhode Island Supreme Court noted that the injury suffered by plaintiffs caused by the collapse of a wall located on city-owned property

[8] In fact, that is the only way plaintiffs could attempt to allege the special damages necessary for them to assert a public nuisance claim.

"affected only persons on the city's premises, not the general public." *Iafrate*, 96 R.I. at 222. "[T]he nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several." *Id*. Here, the alleged "affected interest" is a private interest in private property. The allegation that the private interests of a number of privately-owned residences in a limited part of Tiverton are affected does not establish a right common to the general public or convert this private injury into a public nuisance. The critical inquiry is the nature of the interest affected, not the number of individuals affected.

Third, the so-called moratorium on building and excavation does not and cannot transform private rights into a right common to the general public. Actions by a local government on behalf of private interests cannot change the underlying nature of the common law claim. Here, the Tiverton Town Council's decision to impose the moratorium -- whether unreasonable or unwise -- cannot convert plaintiffs' private claims into a public nuisance. The moratorium is a form of government imposed police power action and, as such, it cannot serve as the gravamen for a public nuisance claim. *See, e.g., Ace Tire Co. v. Waterville*, 302 A.2d 90, 98 (Me. Sup. 1973) ( "[w]hat is not in fact a nuisance cannot be conclusively made so by mere legislative declaration. The final determination of the legal question remains for the courts"; "whether any particular type of business endeavor so injuriously affects the public good as to mandate legislative regulation as a nuisance through the exercise of the police power is, in the first instance, a question for the judgment of the law-making branch of the government, but its final determination . . . is for the courts").

B. FRGC Did Not Control The Nuisance At The Time Of The Alleged Harm

Another critical requirement of a public nuisance lacking in this case is that of control. A defendant is not liable in public nuisance unless he or she controls the offending instrumentality

at the time the harm occurs. This fundamental concept in nuisance law is confirmed in *Citizens for Preservation of Waterman Lake v. Davis*, 420 A.2d 53, 59-60 (R.I. 1980), where the Rhode Island Supreme Court affirmed the dismissal of a public nuisance action against an operator of a commercial dump based on the noise of trucks traveling to and from the site. The flaw in the claim was that the plaintiffs "failed to produce any evidence directly bearing on the amount of noise created by trucks *under [defendant's] control*." (emphasis added). *See also Friends of the Sakonnet v. Dutra*, 738 F. Supp. 623, 633-34 (D.R.I. 1990) ("[t]he paramount question is whether the defendant was in control of the instrumentality alleged to have created the nuisance when the damage occurred."); *Friends of the Sakonnet v. Dutra*, 749 F. Supp. 381, 395 (D. R.I. 1990) ("[o]ne who controls a nuisance is liable for damages caused by that nuisance.").

Here, plaintiffs' expert witness Dr. Suuberg testified at his deposition that FRGC contracted with a waste hauler -- Simpson -- to remove waste material from FRGC's plant to the dump. If after Simpson's trucks left FRGC's plant any harm occurred because Simpson mishandled the material or sold it as fill, FRGC did not have control over these activities and is not responsible for their consequences. *See City of Bloomington, Indiana v. Westinghouse Elec. Corp.*, 891 F.2d 611, 614 (7th Cir. 1989) (the absence of a manufacturer's control over a product at the time the nuisance is created is fatal to any nuisance claim); *Traube v. Freund*, 775 N.E.2d 212, 216 (Ill. App. 2002) (same).

## V. NEGC CANNOT BE LIABLE TO PLAINTIFFS WHOSE PROPERTIES HAVE NO CONTAMINATION

Plaintiffs claim that FRGC's actions resulted in the contamination of each of their respective properties, causing them injury. However, at least 31 plaintiffs have no proof of any kind that their soil is contaminated, requiring dismissal of their claims as a matter of law. *See Adams v. Star Enter.*, 51 F.3d 417, 423 (4th Cir. 1995) (absent impact on property from oil spill,

plaintiffs had no nuisance and negligence claims against oil facility operators); *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 829 (5th Cir. 1993) (absent impact on property from waste, plaintiffs lacked negligence and public nuisance action against waste manufacturers); *Rose v. Union Oil Co.*, No. C 97-3808 FMS, 1999 WL 51819, at *6-7 (N.D. Cal. Feb. 1, 1999) (plaintiffs had no negligence and public nuisance claims when they failed to show that levels of contamination on their property are a risk to health). A list of those plaintiffs and their respective properties will be established at trial and was set forth in NEGC's Statement of Undisputed Facts at ¶ 15.

## PENDING MATTERS

The following matters are currently pending before the Court:[9]

- NEGC's Motion for Partial Summary Judgment.
- NEGC's Motion to Strike Plaintiffs' Remediation Damages Expert Report.
- NEGC's Motion for Protective Order to Prevent the Taking of Deposition of GZA GeoEnvironmental, Inc.
- NEGC's Emergency Motion for Protective Order to Prevent the Taking of the Deposition of William Grota.

[9] Additionally, NEGC anticipates that it will file a motion to compel the 30(b)(6) deposition of the Town of Tiverton (which deposition began on April 14, 2008, but was suspended when the designated deponent testified she had no knowledge on any of the 30(b)(6) topics). NEGC also anticipates filing motions in limine and *Daubert* motions. Finally, NEGC anticipates filing a motion to address, *inter alia*, pretrial publicity.

Dated: April 15, 2008

Respectfully submitted,

**ADLER POLLOCK & SHEEHAN P.C.**

By: */s/ John A. Tarantino*____
John A. Tarantino (#2586)
Patricia K. Rocha (#2793)
David A. Wollin (#4950)
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
(401) 274-7200
(401) 351-4607 (fax)

**KASOWITZ, BENSON, TORRES & FRIEDMAN LLP**
Eric D. Herschmann
David E. Ross
Seth Davis
1633 Broadway
New York, New York 10019
(212) 506-1700

**BISHOP, LONDON & DODDS**
Christina Dodds
3701 Bee Cave Road, Suite 200
Austin, Texas 78746
(512) 479-5000

-and-

**HINCKLEY, ALLEN & SNYDER**
Gerald J. Petros (#2931)
Robin L. Main (#4222)
50 Kennedy Plaza
Providence, RI
(401) 274-2000

*Attorneys for Defendant*
*New England Gas Company,*
*an unincorporated division of*
*Southern Union Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April, 2008, I did send a true copy of the within by electronic means (ECF) to the following:

| | |
|---|---|
| Robert J. McConnell, Esq.<br>Michael G. Rousseau, Esq.<br>Jonathan D. Orent, Esq.<br>Motley Rice LLC<br>321 South Main Street<br>Providence, RI 02940 | Neil T. Leifer<br>Thornton & Naumes, LLP<br>100 Summer Street, 30th Floor<br>Boston, MA 02110 |
| Mark W. Roberts<br>McRoberts, Roberts & Rainer, LLP<br>53 State Street<br>Boston, MA 02109 | Paul Revere, III, Esq.<br>Law Offices of Paul Revere, III<br>297 North Street, Suite 337<br>Hyannis, MA 02601 |
| Jeanne M. Scott<br>Ursillo, Teitz & Ritch, Ltd<br>2 Williams Street<br>Providence, RI 02903 | Brian R. Cunha, Esq.<br>Brian Cunha & Associates, P.C.<br>904 Broadway<br>East Providence, RI 02914 |
| Bruce Gregory Tucker, Esq.<br>55 Hammarlund Way<br>Middletown, RI 02842 | Richard J. Zabbo, Esq.<br>Ratcliffe Burke Harten & Elias LLP<br>160 Financial Plaza<br>Providence, RI 02903 |
| Gregory L. Benik<br>Benik & Associates<br>931 Jefferson Blvd., Suite 2008<br>Warwick, RI 02886 | Paul M. Sanford<br>Burns & Levinson LLP<br>One Citizens Plaza<br>Suite 1100<br>Providence, RI 02903 |
| David A. Crichlow<br>David M. Goldberg<br>Pillsbury Winthrop Shaw Pittman, LLP<br>1540 Broadway<br>New York, NY 10036 | Craig Waksler<br>McGivney & Kluger, P.C<br>One State Street<br>Suite 800<br>Boston, Massachusetts, 02109 |
| Jeffrey Bromme<br>Arnold & Porter LLP<br>555 Twelfth Street, N.W.<br>Washington, DC 20004-1206 | Benjamin V. White, III<br>Kimberly A. Simpson<br>Vetter & White, Incorporated<br>20 Washington Place<br>Providence, RI 02903 |

| | |
|---|---|
| Anthony F. Muri<br>Muri Associates LLC<br>10 Weybosset Street<br>Providence, RI 02903 | William D. Wick<br>Wactor & Wick LLP<br>180 Grand Avenue<br>Suite 950<br>Oakland, CA 94612 |
| Christopher P. McCormack<br>Pullman & Comley LLC<br>850 Main Street<br>Bridgeport, CT 06601 | Matthew B. Kirsner<br>Andrew G. Mauck<br>Troutman Sanders, LLP<br>P.O. Box 1122<br>1001 Haxall Point<br>Richmond, VA 23208 |
| Kerry T. Ryan<br>Emily C. Shanahan<br>Tarlow, Breed, Hart & Rodgers P.C.<br>101 Huntington Avenue<br>Prudential Center<br>Suite 500<br>Boston, MA 02199 | Andrew G. Mauck<br>Troutman Sanders LLP<br>P.O. Box 1122<br>1001 Haxall Point<br>Richmond, VA 23208 |
| David B. Willis<br>Legal Management Services LLC<br>55 Hammarlund Way<br>Middletown, RI 02842 | |

/s/ *John A. Tarantino*

*451259_1.doc*