**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| GAIL, JOHN D.<br>AND JOHN F. CORVELLO, et al.<br><br>*Plaintiffs,*<br>v.<br><br><br><br><br>NEW ENGLAND GAS COMPANY, INC.;<br>*Defendant.* | ) | C.A. No. 05-221T<br>(Consolidated with 05-522T;<br>05-274T; and 05-370T) |

**PLAINTIFFS' OPPOSITION TO NEW ENGLAND GAS COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The Court should deny each basis for NEGCo's motion for summary judgment. First, Plaintiffs' claims are governed by the "discovery rule" and there is at least a material dispute that Plaintiffs did not discover the presence of MGP waste in their neighborhood until 2002. As such, Plaintiffs' claims were filed within the time required under the applicable statutes of limitations. Second, although not addressed by the Defendant in its motion, Plaintiffs without evidence of contamination on their properties are entitled to recover damages from NEGCo because the use moratorium was a foreseeable consequence of NEGCo's disposal of MGP waste in the neighborhood. Third, because the disposal activities of NEGCo were abnormally dangerous and ultrahazardous, it may be held strictly liable for the damages sustained by Plaintiffs. Next, because the presence of MGP waste in the Bay Street neighborhood of Tiverton unreasonably interferes with the heath, safety, welfare, and convenience of the public in general and has specially injured these Plaintiffs, NEGCo is liable for the creation and

maintenance of a public nuisance. Finally, none of the legal arguments offered by NEGCo precludes the award of punitive damages.

## ARGUMENT

### I. THE STATUTES OF LIMITATIONS FOR PLAINTIFFS' CLAIMS ARE GOVERNED BY THE "DISCOVERY RULE"

This case involves claims for property damage following the discovery in 2002 of MGP waste in the Bay Street neighborhood. More than twenty years ago, the Supreme Court of Rhode Island adopted a discovery rule for claims involving injuries to property. See Lee v. Morin, 469 A.2d 358, 360 (R.I. 1983). In its 1991 decision in Boghossian v. Ferland Corporation, the Rhode Island Supreme Court reaffirmed this rule:

> This Court has held that this statute "begins to run when the evidence of injury to property, resulting from the negligent act upon which the action is based, is sufficiently significant to alert the injured party to the possibility of a defect."

Boghossian v. Ferland Corporation, 600 A.2d 288, (R.I. 1991) citing Lee v. Morin, 469 A.2d 358, 360 (R.I. 1983).

The use of the discovery rule in property damages cases is consistent with the long line of Rhode Island cases examining statutes of limitations[1]. As the Supreme Court noted, "[w]e have previously said that the 'policy behind a statute of limitations is to prevent a plaintiff from gaining unfair advantage by carelessly or willfully sleeping on [her] rights." Anthony v. Abbott Laboratories, 490 A.2d 43, 47 (R.I. 1985) citing Romano v. Westinghouse Electric Co., 336 A.2d 555, 560 (R.I. 1975). "However, in situations in which the plaintiff is unaware that her

[1] In addition to the discovery rule found in Boghossian v. Ferland Corporation, 600 A.2d 288, (R.I. 1991), the United States Congress has occupied the field with regard to statutes of limitations in environmental contamination cases. In 42 U.S.C. § 9658, the Congress expressly adopted the discovery rule for environmental cases brought under state law.

legal rights have been infringed, she cannot be said to be 'sleeping on her rights.'" Id. Rhode Island has long adhered to the rule that:

> To construe the statute narrowly so as to preclude a person from obtaining a remedy simply because of the wrong of which he was the victim did not manifest itself for at least two years from the time of the negligent conduct, is clearly inconsistent with the concept of fundamental justice. To require a man to seek a remedy before he knows of his rights, is palpably unjust.

Wilkinson v. Harrington, 243 A.2d 745, 753 (R.I. 1968).

In this case, the Defendant concedes the fact that none of the Plaintiffs knew of the presence of contamination under the public roads in the Bay Street Area generally before 2002, or on their property specifically prior to 2003. Therefore, because none of the Plaintiffs have "slept on their rights" under Rhode Island law they have valid claims that are not barred by the statute of limitations contained in R.I. Gen. Laws § 9-1-13 (1956).

## II. NEGCo IGNORES THE LEGAL SIGNIFICANCE OF THE MORATORIUM WHEN IT CONTENDS THAT IT CANNOT BE LIABLE TO PLAINTIFFS WHOSE PROPERTIES HAVE NO EVIDENCE OF CONTAMINATION

Before addressing New England Gas Company's motion with respect to particular theories of liability, Plaintiffs will first address a property owner's right to recover without proof of contamination. NEGCo's contention that it is entitled to summary judgment as a matter of law as against Plaintiffs who have not adduced evidence of MGP contamination on their properties ignores the fact that these Plaintiffs may recover damages because they are subject to a use moratorium that was necessitated by the wrongful acts of the Defendant. Plaintiffs have repeatedly observed to the Court that the use moratorium was a foreseeable consequence of the Defendant's acts or omissions and, therefore, NEGCo is potentially liable to every Plaintiff within the moratorium area, regardless of whether or not there is contamination on that Plaintiff's property, because the fact of the moratorium has caused them injury. Despite the

Court's repeated invitation to NEGCo to address this legal question, NEGCo failed to address this issue in its motion for summary judgment.[2] Instead, it has simply relied upon a number of environmental cases which have preconditioned recovery on proof of contamination. However, those cases do not address the issue identified by the Court, to wit: the legal significance of the moratorium. Plaintiffs will address the issue here.

Plaintiffs' claims against NEGCo sound in negligence, strict liability for abnormally dangerous activities and public nuisance. If Plaintiffs prevail against NEGCo on any of those theories of liability, they are entitled to recover any damages they sustained that were proximately caused by NEGCo's liability. Under a proximate cause analysis in Rhode Island, a plaintiff is entitled to recover those damages that could reasonably have been foreseen as a natural and probable result of the original act of the negligence (or other liability based conduct) of the defendant. A defendant's liability for damages includes those damages caused by an intervening act, provided the act was a reasonably foreseeable consequence of the defendant's wrongful conduct. Roberts v. Kettelle, et al., 356 A.2d 207, 215 (R.I. 1976); Aldcroft v. The Fidelity and Casualty Co. of N.Y., 259 A.2d 408, 411 (R.I. 1969).

In the case before the Court, Plaintiffs have alleged that NEGCo is liable for the disposal of MGP waste in their neighborhood. Although NEGCo disputes that any MGP waste is in Plaintiffs' neighborhood or that NEGCo is not liable for that disposal, for purposes of summary judgment it must concede that Plaintiffs have adduced such evidence thereby creating at least a factual dispute. Moreover, NEGCo must concede (at least for purposes of this motion) that as a

[2] Indeed, NEGCo's only reference to the moratorium appears in its analysis of public nuisance wherein it argues that "[t]he moratorium is a form of government imposed police power action and, as such, it cannot serve as the gravamen for a public nuisance claim." Defendant's Memorandum of Law at 9. This analysis completely misses the point. Plaintiffs do not contend that the moratorium is the basis for the public nuisance, as NEGCo seems to believe; rather, the moratorium is a result of that nuisance. The public nuisance is the harm or threat of harm posed by the presence of NEGCo's MGP waste. If, as plaintiffs explain herein, the moratorium was a foreseeable consequence of the nuisance created by NEGCo, then NEGCo is liable for the damages resulting from the moratorium.

result of the discovery of contamination, the Town of Tiverton imposed a moratorium affecting Plaintiffs' use of the lands upon which their homes are situated. Applying the Rhode Island law of proximate cause, two issues remain: (1) was the use moratorium a reasonably foreseeable and natural and probable result of the original acts by NEGCo; and (2) does the fact that the intervening moratorium is an exercise of Tiverton's police power somehow preclude it from being a proximate cause of NEGCo's conduct as a matter of law?

The foreseeability of an intervening cause is a question for the jury. Pantalone v. Advanced Energy Delivery Systems, Inc., 694 A.2d 1213, 1215-16 (R.I. 1997), Seide v. Stateof R.I. et al, 875 A.2d 1259, 1270 (R.I. 2005), see also Roberts v. Kettle, 356 A.2d at 215 (finding that the question of intervening and concurrent causation had been properly submitted to the jury.) Thus, it is for the jury to decide whether it was reasonably foreseeable to NEGCo that the discovery of toxic waste within a neighborhood might induce a town government to impose a use moratorium on lands within the area until the condition is remediated.

Moreover, the fact that a reasonably foreseeable intervening event is the exercise of police power or government action does not break the chain of proximate causation and immunize the tortfeasor from the natural and probable consequences of that intervening action. For example, if a police car or fire truck collides on a public road with a third party while racing to a scene caused by the negligence of a defendant, there can be little doubt that the defendant bears liability to the third party if the collision on the public road was a reasonably foreseeable consequence of the government's response to the defendant's conduct. See, e.g. Gossett v. Burnett, 164 S.E.2d 578 (S.C. 1968); State of Ohio v. Lovelace, 137 Ohio App 3d 206, 738 N.E.2d 418 (1999). The fact that the intervening act was an exercise of police power is of no consequence and does not break the chain of proximate causation. The test is still foreseeability.

Nor does the outcome change because the foreseeable governmental action is in response to an environmental or public health crisis. In People Express Airlines, Inc. v. Consolidated Rail Corp., 495 A.2d 107 (N.J. 1985), the New Jersey Supreme Court recognized a right to recover losses that resulted from a government ordered evacuation, even though the feared explosion never materialized. Id. at 108. In recognizing the plaintiff's right to proceed, the New Jersey Supreme Court held:

> . . . [L]osses are recoverable as damages when they are the natural and probable consequence of a defendant's negligence in the sense that they are reasonably to be anticipated in view of defendant's capacity to have foreseen that the particular plaintiff or identifiable class of plaintiffs . . . is demonstrably within the risk created by defendant's negligence.

Id. at 118. As the New Jersey Supreme Court explained, the obviousness of the plaintiff's property interests and the foreseeability of harm to them, combined with the foreseeability of the emergency response, were sufficient to show that defendant's actions were a proximate cause of the alleged injuries. Id.

The same analysis and result applies here. Plaintiffs' interest in the lands upon which their homes are situated is obvious, as was the foreseeability of use restrictions that local government would foreseeably impose to protect the health and welfare of the Tiverton residents. NEGCo's allegedly wrongful conduct set all of this in motion and is, therefore, a proximate cause of Plaintiffs' property value diminution and interference with the use of their lands, whether or not those lands have MGP waste on them. See also Commonwealth of PA v. General Public Utilities Corp., 710 F.2d 117, 123 (3rd Cir. 1983) (finding that states and towns who suffered losses as a result of the evacuation following the Three Mile Island incident had stated sufficient facts to survive summary judgment, even though no dangerous radiation was released); Syracuse Cablesystems, Inc. et al. v. Niagara Mohawk Power Corporation, 173 A.D.2d 138, 140

(N.Y.A.D. 4th 1991) (finding that defendants were liable for damages resulting from building closure after the release of PCBs which interfered with plaintiff's use of property).

NEGCo addresses none of these proximate cause issues in its motion. Instead, it cites three environmental tort claims in which evidence of chemicals on the property was a precondition to recovery. See Adams v. Star Enter., 51 F.3d 417, 423 (4th Cir. 1995) (finding defendants not liable because their damages were from emotional disturbance and loss of value resulting from "stigma", where *Plaintiffs showed no loss of use*); Berry v. Armstrong Rubber Co., 989 F.2d 822, 826 (5th Cir. 1993) (finding summary judgment appropriate where Plaintiffs' losses were from decrease in value due to stigma and there was *no proof of actual damage*); Rose v. Union Oil Co., 1999 U.S. Dist. LEXIS 967, *19 (N.D. Cal. 1999) (finding summary judgment appropriate on negligence claim where there was *no evidence of loss of use*).

If the Tiverton moratorium had never been issued, then NEGCo might have a point and properties without contamination might not have a cause of action. However, Plaintiffs who have no evidence of MGP waste on their land have still suffered a loss of use and a diminution in property values. Their harm comes from being within the moratorium area, a designated zone that was a natural and probable consequence of NEGCo's disposal of MGP waste in the neighborhood.

For these reasons, NEGCo may be liable to those Plaintiffs whose properties as of now have no known MGP contamination.

## III. NEGCo'S DISPOSAL OF MGP WASTE CONSTITUED AN ULTRAHAZARDOUS ACTIVITY SUBJECTING THE DEFENDANT TO STRICT LIABILITY

The Defendant asserts "[n]o Rhode Island court has ever held that the disposal of hazardous waste is an abnormally dangerous activity warranting the imposition of strict

liability." Def's Br. at 5. Defendant then argues that the disposal of such waste could not constitute an ultrahazardous activity because "manufactured gas plants throughout the country routinely and customarily disposed of byproducts of the manufactured gas process which had little or no commercial value by having the material deposited in dumps." Id. at 4. This argument ignores the jurisprudence that an industry standard does not preclude liability. "Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." The T.J. Hooper, 60 F.2d 737, 740 (2d Cir.) (L. Hand, J.) cert. denied, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). Cited in Rock v. State, 681 A.2d 901, 914 (R.I.1996).

Moreover, there is no basis for NEGCo's contention that Rhode Island has precluded claims of strict liability based on the handling and disposal of hazardous waste. Indeed, the Supreme Court of Rhode Island in Wood v. Picillo, 433 A.2d 1244 (1982) noted that:

> [i]t could well be argued that one who utilizes his land for abnormally dangerous activities or for storage of abnormally dangerous substances may be strictly liable for resulting injuries, even in the absence of a finding of nuisance or negligence.

Wood v. Picillo, 433 A.2d 1244, 1250 fn 7 (1982)( judgment against hazardous waste dumper affirmed on the grounds that the dumping constituted a nuisance).

Numerous courts throughout the country have expressly held that the disposal of hazardous and toxic wastes may constitute abnormally dangerous or ultrahazardous activities warranting the application of strict liability. See e.g. Lutz v. Chromatex, Inc., 718 F.Supp. 413, 430 (M.D.Pa. 1989) (holding that under Pennsylvania law, the storage and disposal of hazardous substances may constitute an abnormally dangerous activity); P.R.I.C.E. v. Kenney, 1998 WL

417591 (concluding that under Connecticut law, the disposal of hazardous and toxic waste may constitute an ultrahazardous activity ).[3]

Strict liability has been applied where the toxic and hazardous waste was disposed of directly onto soils, subsoils, surface and/or groundwaters. See Hanlin Group, Inc. v. International Minerals & Chemical Corp, 759 F.Supp. 925, 934 (D.Me. 1990)(finding the disposal of hazardous and toxic chemicals including mercury directly onto soils and a river nearby to be an ultrahazardous activity for which the defendant may be held strictly liable under Maine law); T & E Industries, Inc. v. Safety Light Corp., 123 N.J. 371 (1991)(ruling that the processing, storage and disposal of radium tailings by dumping them on unimproved portions of a site was an abnormally dangerous activity under New Jersey law); Mather v. Birken Manufacturing Co., 1998 WL 920267 at *7 (Conn. Super. 1998)(finding the disposal of hazardous wastes from metal finishing and related manufacturing processes directly into soil and groundwater constituted ultrahazardous activity); State v. Ventron, 94 N.J. 473, 492 (1983)(finding that "no safe way exists to dispose of mercury by simply dumping it onto land or into water" and defendant could be held strictly liable for such disposal activities.).

The Defendant relies upon two Rhode Island cases which are inapposite. In Splendorio, the court reviewed claims by the owners of property adjacent to a wrecking yard of a demolition company where debris from an asbestos remediation project had been illegally stored. See id. at

---

[3] The P.R.I.C.E. court cited similar holdings in other jurisdictions such as Daigle v. Shell Oil Co., 972 F.2d 1527, 1544 (10th Cir. 1992)(under Colorado law and facts of case, disposal of hazardous waste constitutes abnormally dangerous activity and explaining that the Restatement factors "require a particularized inquiry. . . To impose an inflexible strict liability rule on all blasting without consideration of the circumstances would be just as incorrect as [the defendant's] assertion of the opposite rule regarding hazardous wastes); Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Railway Co., 842 F.Supp. 475, 478 (D.N.M. 1993) (holding the storage and disposal of toxic chemical waste constituted abnormally dangerous activity and requiring a particularized, case-specific inquiry explaining that the defendant's contention that blasting was the only abnormally dangerous activity in New Mexico would render the six factors of the Restatement superfluous.); Sterling v. Veliscol Chemical Corp., 647 F.Supp. 303, 315 (W.D. Tenn. 1986) (holding that under Tennessee law storing and disposing of hazardous wastes was an ultrahazardous activity subjecting the defendant to strict liability); Branch v. Western Petroleum, 657 P.2d 267 (1982)(finding that under Utah law defendant could be held strictly liable for the disposal of toxic formation water from its oil refinery).

463. The engineering firm, who inspected and found the asbestos at the property to be demolished, was sued based on strict liability associated with the asbestos. The engineering firm moved for and was granted summary judgment on the basis the engineering firm took no part in the physical demolition of the property or in the placement of the debris at the site at issue. See id. at 463-64, 466. The Splendorio Court specified, it was the demolition contractor's "unanticipated and unlawful actions" which gave rise to the harms claimed by the plaintiff, and therefore, the engineering firm could not be held strictly liable for the alleged injuries. Id. at 466. Nowhere does the Splendorio court hold, or even assert in dicta, that the illegal storage and handling of the asbestos waste by the demolition contractor did not meet the standard of an ultrahazardous activity. The other case cited by the defendant, Toledo v. Van Waters & Rogers, Inc., 92 F.Supp. 2d 44 (D.RI 2000), is also distinguishable. There the District Court did not discuss the application of strict liability to the handling and disposal of hazardous substances. Rather, the court's ruling was restricted to the transportation and packaging of dangerous chemicals, which the court found takes place daily and may be made safe through the exercise of reasonable care. See Id. at 56.

Proof that NEGCo may be strictly liable for abnormally dangerous activities includes; 1) expert testimony from Dr. Eric Suuberg that the use of toxic MGP waste as fill cannot be made safe;[4] and 2) eyewitness evidence that NEGCo allowed its waste to be used for that purpose.[5] Moreover, if NEGCo claims that it cannot be responsible because the disposal was done by a third party (a hauler) with whom it contracted to remove its MGP waste, that defense is not available. Both Rhode Island and Massachusetts law (the Charles St. facility was located in Massachusetts) treat these activities as creating a non-delegable duty by NEGCo. See e.g. Ballet

[4] In fact Dr. Suuberg testified at his deposition that this material had been banned from many public dumps throughout the country. See Deposition of Eric Suuberg, 3/12/08 at 137-138.
[5] See videotaped trial testimony of Jose Souza, 2/12/08 at page 40-45

Fabrics, Inc. v. Four Dee Realty Co. Inc., 314 A.2d 1 (R.I. 1974); East Coast Collision & Restoration, Inc. v. Allyn, 742 A.2d 273 (R.I. 1999); Whalen v. Shivek, 93 N.E.2d 393 (Mass. 1950).

## IV. NEGCo IS LIABLE FOR THE CREATION OF A PUBLIC NUISANCE IN THE BAY STREET NEIGHBORHOOD OF TIVERTON

Rhode Island has long recognized the use of public nuisance actions to remedy public health threats caused by environmental contaminants. For example, in one of the earliest reported cases, Payne & Butler v. Providence Gas Co., 31 R.I. 295, 77 A. 145, 150 (1910), the Rhode Island Supreme Court held that:

> any manufacturer who allows his deleterious waste product to contaminate the waters of the State, be they public or private, is liable to any person who is injured thereby in his private capacity and apart from being merely one of the public . . . .

Since then, the doctrine has been consistently applied in situations where a company creates an environmental threat to the health and safety of Rhode Islanders. Reitsma v. Recchia, 2000 WL 1781960 at *6 (R.I. Super. 2000) (Williams, J.) ("the odors emanating from the Recchia property constitute a public nuisance, which in the absence of relief, will continue to unreasonably interfere with neighbors' use and enjoyment of their premises."); Whitehouse v. New England Ecological Development, Inc., 1999 WL 1001188 at *6 (R.I. Super. Oct. 28, 1999) (Silverstein, J.) (suit against companies that disposed of out-of-state waste in Rhode Island); Pine v. Vinagro, 1996 WL 937004 at *21 (R.I. Super.) (Israel, J.) ("maintaining of open stockpiles of unprocessed construction and demolition debris, especially if it contains partially decomposed, or rotting, organic material is a public nuisance because of the plain risk of fire, smoke and odors."); Pine v. Shell Oil Co., 1993 WL 389396 (D.R.I.) (public nuisance claim against lessee of a gasoline service station alleging that it released a quantity of hydrocarbon pollution into the ground surrounding the service station, thus polluting the ground and the water supply); Wood v. Picillo,

443 A.2d 1244 (R.I. 1982) (defendants liable for creating a public nuisance by maintaining a hazardous waste dump site that polluted the land and water surrounding the property); Braun v. Iannotti, 57 R.I. 194, 189 A. 25 (R.I. 1937) (public nuisance created by emitting smoke and soot from smokestack). See also Tom Kuhnle, The Rebirth of Common Law Actions for Addressing Hazardous Waste Contamination, 15 Stan. Envtl. L. J. 187, 214 (1996) (recognizing Rhode Island was one of the first states to uphold a public nuisance claim in a modern hazardous waste contamination case). [6]

A. The Presence of Coal Gasification Wastes in the Bay Street Neighborhood of Tiverton Has Unreasonably Interfered with the Health, Safety, Welfare, Comfort and Convenience of the Public.

NEGCo offers several legal arguments explaining why it cannot be liable for public nuisance. None justifies summary judgment. First, NEGCo contends that "Plaintiffs do not allege any interference with rights common to the general public such as the rights to fish in a stream or to use the public roads." Def's Br. at 7. This assertion ignores Plaintiffs' evidence that the Defendant's coal gasification waste in the Bay Street neighborhood of Tiverton "unreasonably interferes with the health, safety, peace, comfort or convenience of the general

[6] This use of public nuisance law in Rhode Island is in accord with precedent from around the country. As one commentator has noted:

> Because of its flexibility, common law nuisance continues to play a vital role in complementing statutory environmental enforcement tools.... **Environmental harm is the quintessential public nuisance.** In fact, modern environmental and energy statutes are codifications of the common law of public nuisance.

Matthew F. Pawa & Benjamin A. Krass, Behind the Curve: The National Media's Reporting on Global Warming, 33 B.C. Envtl. Aff. L. Rev. 485, 487-88 (2006) (emphasis added). See also Cox v. City of Dallas, 256 F.3d 281, 291 (5th Cir. 2001) ("The theory of nuisance lends itself naturally to combating the harms created by environmental problems."); Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, 101 F.3d 503, 505 (7th Cir.1996) (the "interests [of environmental statutes] overlap to a great extent the interests that nuisance law protects."); State v. Schweda, 303 Wis.2d 353, 404, 736 N.W.2d 49, 75 (Wis. 2007) ("Scholarly commentary recognizes the link between modern statutory environmental law and the common law of nuisance."); Richard A. Epstein, Regulation-And Contract-In Environmental Law, 93 W. Va. L.Rev. 859, 862 (1990-91) ("[w]hen you go back to the early history of environmental law, the one substantive area that you would want to turn to more than any other would be the common law of nuisance."); William H. Rodgers, Jr., Handbook on Environmental Law § 2.1, at 100 (1977) ("The deepest doctrinal roots of modern environmental law are found in principles of nuisance.").

community" constituting a public nuisance. Citizens for the Preservation of Waterman Lake v. Davis, 420 A.2d 53, 59 (R.I. 1980) citing Restatement (Second) Torts § 822 cmt. g.

This Court has recognized that "[i]n order to prevail on a public nuisance claim, a plaintiff must establish that a defendant unreasonably interfered with a "right common to the general public" and that the plaintiff sustained "special damages" as a result of the interference.[7] Hydro-Manufacturing, 640 A.2d 950, 957-58 (citing Iafrate v. Ramsden, 96 R.I. 216, 190 A.2d 473, 476 (1963)); Clark v. Peckham, 10 R.I. 35 (1871)." Moreover, "[a] public nuisance may consist of an "'aggregation of private injuries [that] becomes so great and extensive as to constitute a public annoyance and inconvenience, and wrong against the community.' " Sullivan v. Amer. Mfg. Co. of Massachusetts, 33 F.2d 690, 692 (4th Cir.1929) (quoting Wesson v. Washburn Iron Co., 95 Mass. 95, 13 Allen 95, 90 Am. Dec. 181 (1866))." Furthermore, it is well recognized that "[t]he obstruction of a public highway is a public nuisance…" Restatement (Second) Torts § 822 cmt. G. Finally, "the spread of smoke, dust or fumes over a considerable area filled with private residences may interfere also with the use of the public streets or affect the health of so many persons as to involve the interests of the public at large." Id.

The presence of contamination in Tiverton's Bay Street neighborhood has unreasonably interfered with the health, safety, and welfare of the public in a multitude of ways. Numerous environmental reports have documented the presence of contamination under the public streets and in the public right of ways throughout the Bay Street neighborhood. The waste, which resulted in the imposition of an emergency moratorium, also affected the ability of the Town to make improvements to utilities within the area including maintenance of telephone and sewer lines. The threat of release of contaminants contained within the soil on public and private lands

[7] Importantly, because the Defendant has not brought summary judgment on the issue of "special damages" the Plaintiffs will not discuss that here.

threatens to affect the health and safety of individuals working within the community or traveling throughout the area. Third, the contamination was discovered in the public parks of Tiverton. Finally, the Town of Tiverton has lost the ability to collect valuable tax revenue from these properties because of the diminution of value of the properties within the moratorium area.

Defendant also claims that "there is no claim for public nuisance where the alleged impact is only to a subset of privately owned properties in a limited geographic area." Def's Br. at 8. Defendant's contention here misses the point and confuses the legal requirements of public nuisance with that of another tort altogether, private nuisance. The critical inquiry for public nuisance is not the location of the contamination but rather the reasonableness of the interference with the public rights. As this Court has previously stated, "[h]istorically, claims for private nuisances have been 'narrowly restricted to the invasion of interests in the use or enjoyment of land' caused by a defendant's use of his own property. By contrast, claims of public nuisance 'extend[ed] to virtually any form of annoyance or inconvenience interfering with common public rights." (internal citations omitted) Corvello v. New England Gas Co., Inc., 460 F.Supp.2d 314, 323 (D.R.I. 2006). Because Plaintiffs can demonstrate an unreasonable interference with a right common to the general public and a special injury distinct from that suffered by the public at large, they have a viable claim for public nuisance to present to the jury, and therefore summary judgment should be denied. This is the case whether Plaintiffs can currently prove that there properties are contaminated or not.

B. NEGCo Is Liable for the Creation and Maintenance of a Public Nuisance without Regard to the Issue of Control.

The Defendant's argument that it does not control the nuisance incorrectly states the applicable law. Individuals or entities that either created or contributed to the creation of a

public nuisance may be liable for that nuisance without regard to the issue of control. In Friends of Sakonnet v. Dutra, 738 F. Supp. 623 (D.R.I. 1990), the United States District Court found that Rhode Island law does not bar a public nuisance claim against a defendant that no longer controls the property in question: "suits should be allowed . . . against one who is alleged to have caused damages by a nuisance even if that person no longer controls the alleged nuisance." Id. at 633. Recognizing this rule, this Court stated that "[l]iability also may be predicated on the conduct of servants, agents or independent contractors." Corvello v. New England Gas Co., Inc., 460 F.Supp.2d 314, 323 (D.R.I. 2006) citing Restatement (Second) of Torts § 824. cmt. c.

The Rhode Island Supreme Court and the United States District Court for Rhode Island have applied this principle to numerous public nuisance cases over the last century, properly concluding that a defendant's participation in the creation of a public nuisance renders him liable for the resulting damages. See, e.g. Payne & Butler, 31 R.I. 295, 358, 77 A. 145, 170 (R.I. 1910)(chemical manufacturer liable in nuisance even though it was not in control of the private or public waters it contaminated, the court found the manufacturer liable for creating a public nuisance.) Id. See also Friends of the Sakonnet, 738 F. Supp. at 633-34 (defendants who contaminated the waters of Rhode Island liable under public nuisance despite the fact that the defendants exercised no control over the polluted waters); Pine v. Shell Oil Co., 1993 U.S. Dist. LEXIS 21043 at 14-15 (finding Shell Oil created a nuisance by releasing hydrocarbons into the ground despite the fact that it did not control the land it had polluted); Wood v. Picillo, 443 A.2d at 1248 (defendants created a public nuisance by allowing chemical wastes to contaminate surrounding property despite the fact that defendants did not control the property that had become contaminated).[8]

[8] See Anderson v. W.R. Grace & Co., 628 F. Supp. 1219 (D. Mass. 1986) (groundwater contamination); California ex rel. California Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772 (9th Cir. 1998), cert. denied, 525

This rule has been applied in environmental contamination cases analogous to the instant case. In United States v. Hooker Chems. & Plastics Corp., 722 F. Supp. 960 (W.D.N.Y. 1989) -- the "Love Canal" case -- the court concluded that where the chemical manufacturer sat by idly and watched the land be developed for residences and schools, it could be liable under public nuisance despite the fact that it had originally provided the City with warnings about the hazardous chemicals 25 years earlier. Id. at 971**.** Neither the passage of time, nor the intervening sale of the property, was sufficient to shield the chemical manufacturers from public nuisance liability.

## V. NEGCo's CONDUCT WAS SUFFICIENT TO MAKE IT LIABLE TO THE PLAINTIFFS IN PUNITIVE DAMAGES

The Defendant offers four reasons why the Plaintiffs' claims for punitive damages must fail. However, none of these arguments is supported by the law of the State of Rhode Island.

Defendant's claim that "there is no evidence that FRGC intended to harm anyone, at anytime" ignores the fact that Rhode Island law, like that of many other states, does not limit punitive damages to cases of intentional torts. Regan v. Cherry Corp., 706 F.Supp 145, 153 (D.R.I. 1989). (punitive damages claim available in trespass case.) See also United States v. Hooker Chemicals & Plastic Corp., 850 F. Supp. 993 (W.D.N.Y. 1994). (punitive damages available in public nuisance case) Thus, the underlying conduct need not be that of an intentional tort provided there is evidence of intentional conduct. Regan v. Cherry Corp., 706 F.Supp 145, 153 (D.R.I. 1989).

---

U.S. 822, 47 S. Ct. 64, 142 L. Ed. 2d 51 (groundwater contamination); Branch v. Western Petroleum, Inc., 657 P.2d 267 (Utah 1982) (and cases cited therein); Lewis v. General Electric Co., 37 F. Supp. 2d 55 (D. Mass. 1999); B&D Molded Prodts. v. Vitek Research Corp., 1998 Conn. Super. LEXIS 2363 (1998); New Jersey Dep't of Envtl. Protection and Energy v. Gloucester Envtl. Mgmt. Servs., 821 F. Supp. 999 (D.N.J. 1993); North Carolina ex rel. Howes v. W.R. Peele, 876 F. Supp. 733 (E.D.N.C. 1995).

Nor must a defendant, as NEGCo contends, know the identity of its victim to be liable for punitive damages. As the Supreme Court has held, "punitive damages in tort cases may be awarded not only for actual intent to injure or evil motive, but also for recklessness, serious indifference to or disregard for the rights of others, or even gross negligence." Smith v. Wade, 461 U.S. 30, 48 (1983)(In reaching this determination, the Supreme Court examined the substantive law of a multitude of jurisdictions including an analysis of Rhode Island Law.). The Supreme Court concluded that ""willfulness" did not mean intent to cause injury, but only voluntary action." Id. The Rhode Island Supreme Court has similarly defined the terms "willful" and "reckless" to relate to the nature of the conduct and not the injury. The Court held:

> Willful means deliberate. It necessarily implies a certain degree of willpower or evil purpose or criminal intent. It implies a purpose or willingness to commit the act referred to, and it excludes the inference that it might have resulted from accident or mistake. Wanton means without regard to the rights of others. Reckless connotes something more than negligence of the defendant. It connotes a conscious and intentional driving that the driver knows or should know creates an unreasonable risk of harm to others, even though he has no actual intent to harm him.

State v. Watkins, 448 A.2d 1260, 1265-1266 (R.I. 1982).

Because the MGP waste originated just across the border in Fall River, Massachusetts, NEGCo offers the novel argument that "punitive damages are improper here because, as the United States Supreme Court has held, a state does not have 'a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction.' State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 421 (2003)." Def's Br. at 12. The fact that NEGCo's conduct straddled the state line between Fall River and Tiverton is not what the Supreme Court was concerned with in State Farm. Rather, the Supreme Court was concerned with "State Farm being condemned for its nationwide policies rather than for conduct directed toward the Campbells." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 420

(2003). If proven here, NEGCo would be condemned for its conduct which affected the Plaintiffs.

Finally, Defendant's argument that there "has been no 'intentional' invasion by FRGC onto the Plaintiffs' property" must also fail. Def's. Br. at 12. Unlike the example presented in the Restatement (Second) of Torts § 825, Illustration 3, this case involves voluntary conduct in the disposal of waste. This is not a case involving migration of waste from a source.

Therefore, the Court should deny Defendant's motion with regard to punitive damages.

## CONCLUSION

For the foregoing reasons this Court should conclude DENY Defendant's motion for summary judgment.

DATED: April 16, 2008

Respectfully Submitted,

/s/ Jonathan D. Orent
Robert J. McConnell (#3888)
Jonathan D. Orent (#7408)
Motley Rice LLC
321 South Main Street
Providence, RI 02940

Neil T. Leifer
David C. Strouss
Brad J. Mitchell
Thornton & Naumes, LLP
100 Summer Street, 30th Floor
Boston, MA 02110

Mark W. Roberts

McRoberts, Roberts & Rainer
51 State Street
Boston, MA 02109

Stephen P. Harten (#4102)
Richard J. Zabbo (#6861)
Ratcliffe Burke Harten & Elias LLP
1600 Financial Plaza
Providence, RI 02903

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of April, 2008, a copy of the foregoing was served to all counsel of record via ECF.

__/s/ Jonathan D. Orent_________