## Orent, Jonathan D.

**From:** Orent, Jonathan D.
**Sent:** Friday, April 11, 2008 2:17 PM
**To:** 'DRoss@kasowitz.com'
**Subject:** Re: Corvello: 30(b)(6) Deposition of New England Gas Co. Next Tuesday, April 15

Please advise as to when we might receive his reliance material?

----- Original Message -----
From: David Ross <DRoss@kasowitz.com>
To: Orent, Jonathan D.
Cc: Tarantino, John <jtarantino@apslaw.com>; Petros, Gerald J. <gpetros@haslaw.com>; Seth Davis <SDavis@kasowitz.com>; Noelle Kowalczyk <NKowalczyk@kasowitz.com>; Christina Dodds <cdodds@bishoplondon.com>; Main, Robin L. <rmain@haslaw.com>; Edward Lee <ELee@kasowitz.com>; David Ross <DRoss@kasowitz.com>
Sent: Fri Apr 11 14:14:34 2008
Subject: Corvello: 30(b)(6) Deposition of New England Gas Co. Next Tuesday, April 15

Dear Jon: Due to travel-related issues, we will need to start that deposition at 1pm. Thanks for your anticipated cooperation.

Regards,
David

David E. Ross, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019-6799
(T) 212-506-1748
(F) 212-506-1800
dross@kasowitz.com

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

## Orent, Jonathan D.

---

**From:** Orent, Jonathan D.
**Sent:** Wednesday, April 09, 2008 2:26 PM
**To:** 'David Ross'; gpetros@haslaw.com; Tarantino, John
**Cc:** McConnell, Bob; Neil Leifer; David Strouss; Mark Roberts; Steve Harten
**Subject:** Rule 30(b)(6) deposition
**Importance:** High

Counsel:

Per our agreement, we will take the videotaped Rule 30(b)(6) deposition on April 15, 2008 beginning at 9:30am. The deposition will be at Motley Rice 321 S. Main St. in Providence. Please let me know by the end of the day if you are willing to provide us the reliance material of your Rule 30(b)(6) witness by Thursday afternoon at 4:30pm.

**Jonathan D. Orent** | Attorney at Law | Motley Rice LLC
321 South Main Street | Providence, RI 02903-7108 | jorent@motleyrice.com
**o.** 401.457.7723 | **c.** 401.465.8549 | **f.** 401.457.7708

Volume: 1
Pages: 1 -
Exhibits: 1 -

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
CASE NO. 05-0221T
(Related Cases: 05-274T;
05-370T; 05-522T)

---------------------x

GAIL, JOHN D. and JOHN F. CORVELLO,
et al.,
Plaintiffs,
V.
NEW ENGLAND GAS COMPANY,
Defendant.

---------------------x

30(b)(6) DEPOSITION OF NEW ENGLAND GAS COMPANY
Through LOUIS PAUL SOLDANO
Tuesday, April 15, 2008, 1:10 p.m.
Motley Rice, LLC
321 South Main Street
Providence, Rhode Island
Reporter: Rosemary F. Grogan, CSR, RPR



APPEARANCES:

Representing the Plaintiffs:
MOTLEY RICE, LLC
321 South Main Street
Providence, RI 02940
401-457-7700
jorent@motleyrice.com
BY: JONATHAN D. ORENT, ESQUIRE

Representing the Defendant:
KAWOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019-6799
212-506-1700
DROSS@KASOWITZ.COM
BY: DAVID E. ROSS, ESQUIRE

Also present:
Les Kahl, Videographer



INDEX

WITNESS: PAGE NO.
LOUIS PAUL SOLDANO
By Mr. Ross 4

EXHIBITS

NO. DESCRIPTION PAGE NO.
1 Notice of Rule 30(b)(6) Deposition of Defendant and Request for Documents and Attachment
2 New England Gas Company's Objections and Responses to Plaintiffs' Rule 30(b)6 Notices of Deposition and Document Requests



THIS IS A DRAFT TRANSCRIPT

This transcription has been neither checked nor proofread. It is a rough draft transcript, NOT a certified transcript. The realtime output my contain computer-generated mistranslations of stenotype code, resulting in nonsensical word combinations, or untranslated stenotype symbols which cannot be deciphered by non-stenotypists. Corrections will be made in the preparation of the certified transcript, resulting in differences in page and line numbers, punctuation and formatting.

The court reporting firm and the court reporter, Rosemary F. Grogan, are not responsible for the misuse of this realtime draft transcription by anyone.

YOUR REQUEST OF A ROUGH DRAFT CONSTITUTES AN ORDER FOR THE FINAL CERTIFIED TRANSCRIPT. THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL TRANSCRIPT WHICH MAY BE RELIED UPON FOR PURPOSES OF VERBATIM CITATION OF TESTIMONY.

Rosemary F. Grogan, RPR

(Exhibit Nos. 1 and 2 Marked for Identification)

EXHIBIT E

tabbies

THE VIDEOGRAPHER: The time is 1:09 p.m., April 15th, 2008. This is tape No. 1 of the videotaped deposition of Louis Soldano taken by plaintiff in the matter of Corvello versus New England Gas Company in the United States District Court, District of Rhode Island, Case No. 1:05-cv-00221-T-LDA, taken on April 15th, 2008.

My name is Les Kahl. I'm a legal videographer representing Esquire Deposition Services. The court reporter is Rosemary Grogan also in association was Esquire.

This deposition is being held at the firm of Motley Rice, 321 South Main Street, Providence, Rhode Island.

Will counsel please introduce themselves for the record.

MR. ORENT: John Orent for the plaintiffs.

MR. ROSS: David Ross for the defendant. I'm here on behalf of Kawowitz, Benson, Torres & Friedman.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

LOUIS PAUL SOLDANO, having been satisfactorily identified by the production of a



driver's license, and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. ORENT:

MR. ROSS: I would just note, we would like -- the witness would like to review, correct, and sign the transcript. Thank you.

MR. ORENT: And I also want to note for the record that I premarked two exhibits to this deposition. Exhibit 1 is the Notice of Deposition for today; and Exhibit 2, which I now hand over to you, is something I received by email from defense counsel about an hour and 15 minutes ago; that is their objections to this deposition.

I'm going to keep this deposition open and reserve all rights with respect to this deposition at the end of the day today, so that I can read through that in more detail, and if there are any issues that come up during this deposition, deal with that accordingly.

BY MR. ORENT:

Q. Would you state your name for the record, please?



A. My name is Louis Soldano.

Q. You understand today you're testifying on behalf New England Gas Company?

A. That is correct.

Q. Okay. When is the first time that New England Gas Company learned that waste materials and -- were hazardous from the manufacture gas process?

MR. ROSS: Can I just note, Mr. Orent, that it may speed things along, that the objections that have been asserted in what you've been premarked as Exhibit 2 at page one and two of Exhibit 2, confirm that New England Gas Company has no witness who is knowledgeable or could reasonably become knowledgeable in a manner sufficient to address the inquiries in the January 28th notice.

So Mr. Soldano is not prepared to and is not going to be testifying today on topics one, two, three, four or five of the January 28th notice.

I realize you only got that objection an hour and 15 minutes ago. That's correct; but regardless, that's the fact as stated therein.

MR. ORENT: Well, you know, I think that it's your legal obligation to prepare -- to adequately prepare a witness.



I will ask the question and you can answer it.

BY MR. ORENT:

Q. Again, by what date did New England Gas Company first learn that materials found in MGP waste could be hazardous to human health?

MR. ROSS: So let me just clarify if my last statement wasn't clear. The company is not putting forth any witness to address that topic or any of the topics in the February 28 (sic) notice, other than we've explained in our objections and clarification.

The witness has not been prepared on the subject because of the explanation given in our objection and response. So Mr. Soldano is not going to be answering questions about those topics because they are either objectable or they're covered under the explanation that we've given.

MR. ORENT: Well, I think it's in this situation, extremely egregious for counsel show up after we had given a notice more than two months ago for this very deposition to occur on the day of with less than an hour and a half before a deposition, to waste my time, to waste your time, and to waste the witness' time to bring someone

here to say you're not offering him as to any of the topics discussed, what exactly --
MR. ROSS: Why don't you finish the statement.
MR. ORENT: What exactly are the topics?
MR. ROSS: Well, there are two notices that are covered by your Exhibit 1, I believe.
MR. ORENT: No, there's --
MR. ROSS: Okay; fine. There were two notices served; one was on January 28; one was on January 30th, served by plaintiffs.
Mr. Soldano is prepared to testify to the matters with respect to the January 30th notice, that is the topic in that notice. So he traveled from Texas to be here today to be responsive to your request to the extent they're appropriate, and he's ready to answer those questions.
MR. ORENT: Well, my understanding --
MR. ROSS: By the way, just for the record, we -- I did call you, and you and I did speak yesterday, and I did put you on notice that we would be asserting objections with respect to the February 28th (sic) topics, but the record will speak for itself as to whether or not the objections are what they are, and we think that



given the Magistrate's ruling in this case on February 1, and other matters with respect to the reasonableness of the inquiry in a case that involves records that are 100 years old, and there's no living witness to the company --
MR. ORENT: Well --
MR. ROSS: -- who knows anything about them; that it's inappropriate to be putting such questions to the company and requiring it to read the contents of 400 boxes of ancient documents.
MR. ORENT: Well, that is contrary to the case law throughout the -- unanimous case law throughout the country, and in fact, I'm going to take this opportunity to adjourn. I'm going to try to get Judge Torres on the phone so that we can resolve this issue.
MR. ROSS: I would just point out that even if Judge Torres does address the issue right now, the witness, nevertheless, has not been prepared on the topics.
MR. ORENT: Then I'm just informing counsel of my right to seek sanctions, and I'm going to get Judge Torres on the phone.
THE VIDEOGRAPHER: Going off the record; both



parties agree?
MR. ROSS: Sure. I would like to get my co-counsel on the call, if we're going to have a call.
THE VIDEOGRAPHER: The time is 1:16 p.m., April 15th. We're going off the record.
(Short Recess)
THE VIDEOGRAPHER: The time is 1:48 p.m., April 15th, 2008. We are back on the record.
MR. ROSS: We are awaiting a call back from the Judge, assuming that he is available, to address issues raised by plaintiffs' counsel. We had an off-the-record conversation, counsel and I did, with respect to the January 30th, 2008, 30(b)(6) Notice, which was also served by the plaintiffs in addition to the January 28th notice.
The witness fully prepared and is ready to testify with respect to the subject matters of the January 30th, 2008 notice. Mr. Orent advised that he was under the understanding that plaintiffs either had withdrawn or were preparing to withdraw or would not proceed with respect to that notice, and that he was not -- he himself was not prepared to examine the witness with respect to the subject



matter.
We received no communication of any kind from plaintiffs' counsel that that notice was withdrawn. And when plaintiffs' counsel did request that we appear for the 30(b)(6) deposition of New England Gas Company, it was with respect to the notices, plural.
So our witness, who has come from Texas is prepared to respond to the subject matters of the January 30th notice.
MR. ORENT: Just to clarify, I didn't say that -- let me clarify the plaintiffs.' position.
My position is that I believe that the documents refer to and the knowledge base stemming from the January 28th Notice of Deposition, Exhibit 1 to today, is a prerequisite to conducting the investigation into the information conducted into the January 30th, 2008.
It was not my intention to go over unnecessarily the material from the January 30, 2008 notice at this time.
MR. ROSS: And the defendant's position is that if plaintiffs are pressing for responses on that notice, they should question the witness on it

13

now. I think any fair review of the January 30th notice will make clear that it is not linked in any way to the information that would be provided from the January 28th 30(b)(6) Notice.

I am not seeking to compel the plaintiffs to proceed with a deposition on a subject matter that they've dropped. But the point is, we've got no notice that they dropped it, and prepared the witness on the subject matter as a result.

And if you're not proceeding on that basis, we'll reserve our rights with respect to the matter.

MR. ORENT: Well, I think before we -- before I make any decision as to whether or not to go forward or not, I'm going to seek the guidance of the Court, when the Court calls us back. And between now and then, I will review what has been produced to me this morning, the Exhibit B (sic), New England Gas Company's Objections to Plaintiffs' Rule 30(b)(6) Notices of Deposition and Document Requests; and having read that, I may be in a better position one way or the other to either question this particular witness or not.

MR. ORENT: You said Exhibit B. Did you mean

14

Exhibit 2?

MR. ORENT: Exhibit 2.

MR. ROSS: All right. Let's go off the record. We'll wait to see if the Court is available.

THE VIDEOGRAPHER: The time is 1:53. We're going off the record.

(Short Recess)

(Short Recess)

THE VIDEOGRAPHER: The time is 2:20. We are back on the record.

MR. ORENT: We have spoken off the record and determined that it's probably best at this point to continue with with the deposition on the January 30th, notice reserving of course, all of our rights with respect to the January 28th notice. And with that I think we'll proceed. Counsel do you wish to add anything.

MR. ROSS: Nope, I'm glad we're proceeding since I said as I said Mr. Soldano came from Texas to respond to these inquiries to the best of hissability.

BY MR. ORENT:

Q. What did you do to prepare for today?

15

A. I read the notices that were provided to me. I met with counsel on several occasions. Had discussions with counsel on several occasions and I spoke with Mr. David Black.

Q. Who is Mr. David Black?

A. David Black is the chief operating officer of New England Gas Company.

Q. When did Mr. Black first become the chief operating officer for New England Gas?

A. I'm not sure.

Q. Okay. Is he currently in that position?

A. Yes.

Q. And is that a position -- is he employed by National Grid?

MR. ROSS: Objection to form.

A. No, he's employed by New England Gas Company.

Q. Okay. National Grid owns New England Gas currently; is that correct?

A. No.

Q. Who owns New England Gas?

A. New England Gas Company is owned by Southern Union Company.

MR. ROSS: The division, correct?

A. The division, yes.

16

BY MR. ORENT:

Q. Okay.

Q. Approximately how long did you meet with counsel prior to your deposition?

A. I'm not sure I understand the question. How far -- how long ago I met with counsel or.

Q. For how many hours did you meet with counsel?

A. It was on several occasions that we met or had conference calls. It could be a number of hours. I'd be guessing.

Q. When were you first contacted about being a Rule 30(b)(6) designee?

A. For this deposition notice, I believe it was late February.

Q. And what is your -- strike that.

Who is your employer currently?

A. I am employed by pan handle eastern pipeline company LP.

Q. And do they have a connection with Southern Union?

A. They handle eastern pipeline company is a wholly-owned indirect subsidiary of Southern Union Company.

Q. Do you know how it was that you came to be the

Rule 30(b)(6) disegg me to of Southern Union?
A. Yes.
Q. And how is it?
A. My supervisor asked me.
Q. Do you know why your supervisor asked new particular?
A. No.
Q. As opposed to someone else?
A. No.
Q. And what is your primary profession?
MR. ROSS: Before you answer that, I don't object to the question, but I wanted to know from you, Jonathan, whether you have read Mr. Soldano's prior deposition in this case as a 30(b)(6) witness that was taken by plaintiffs because he lays out his entire job history and experience --
MR. ORENT: I just want to see where currently --
MR. ROSS: If you ask him, he'll tell you that nothing has changed since his prior testimony in which he spent 20 minutes describing his history.
MR. ORENT: Okay, if that's the case then.
BY MR. ORENT:
Q. Is that the case, that nothing has changed



since your prior deposition in New York?
A. Yes, that's correct.
Q. And that was the stone and Webster?
A. Yes.
Q. 30(b)(6); is that right?
A. Yes.
Q. Let me ask you, what documents did you bring with you here today?
A. I brought a copy of two 30(b)(6) notices, one dated January 28th and 1 January 30th. And a memorandum and order of the court in this matter.
Q. If I might take a look at both of those?
A. Certainly.
MR. ORENT: I'm going to mark this as Exhibit 3, if that's all right with you.
A. Yes, fine.
MR. ORENT: Okay.
(Exhibit No. Marked for Identification) three
BY MR. ORENT:
Q. Just because we don't have a copy of the January 30th notice on the record here and there's -- that's contained in Exhibit 3.
Are you prepared to fully talk about each of the subject areas in Exhibit 3 relating to the



January 30th, deposition notice?
MR. ROSS: Is your question subject to the objections that the company has asserted in Exhibit 2?
MR. ORENT: Well, I haven't read all of the objections, but my understanding is that as you sit here today, that as to the January 30th notice of deposition, you're able to testify to those items. The objections and the issue that's outstanding before the Court is relative to the January 28th notice of deposition.; is that correct.
MR. ROSS: Actually there are a second set of objections in -- contained within Exhibit 2 that address the topics in what you've now -- well, in the January 30th notice.
MR. ORENT: Okay.
MR. ROSS: So if you turn to page.
MR. ORENT: Nine.
MR. ROSS: Turn to page eight, starting at page eight, the topics themselves are reprinted followed by the company's objections with respect to each of those. I'm not trying to interfere with your examination at all but.
MR. ORENT: That's fine.



MR. ROSS: But your question.
MR. ORENT: I appreciate that. I want to create a fair record.
BY MR. ORENT:
Q. Which -- so that I'm clear, which of these topic areas are you prepared to testify to today?
A. The topic areas in the notice of the January 30th notice, all of the subject matters, subject to the objections that have been formed and of course the knowledge of the company.
Q. Did you review any documents in preparation for your deposition?
A. I think we covered that already, but the answer again will be the documents that I brought with me, the memorandum and order, the two notices of the deposition, and I did briefly review the objections that have been served with respect to these notices of deposition and an index of 417 boxes that have been produced in this case and make it available, I believe, for the last 15 months.
Q. And when did you first read the objections to the notices of deposition for today?
A. This morning.
MR. ORENT: I want to mark as Exhibit 4, a

letter from David wall letter at add letter Pollack and she unanimous dated January 30th, 2007 to Neal Leber, and this is the cover letter and index I believe you're referring to. This is the original index.

MR. ROSS: Did you say 2007 or 2008?

MR. ORENT: 2007.

MR. ROSS: Okay.

BY MR. ORENT:

Q. Have you seen that letter before?

MR. ROSS: Do you have a copy for me.

MR. ORENT: I do.

MR. ROSS: Thank you. Hold on one minute before the witness answers. Give me a chance to look at it.

A. I have not seen the letter, the cover letter before. The index looks similar to the index I have seen but it has fewer entries and I can't be sure it's exact -- the exact same entry index.

Q. Now, you said it has fewer entries. When did you first see the index that you're referring to earlier?

A. Yesterday evening.

Q. Okay.



MR. ROSS: I just note for the record that we did produce a supplemental index with --

MR. ORENT: I'm going to mark that.

MR. ROSS: Fine.

MR. ORENT: What is this five.

A. Yes the new one will be five.

MR. ORENT: Unfortunately I don't have extra copies of Exhibit 5, but I just want you to take a quick look. And counsel can.

(Exhibit No. 5 Marked for Identification) five

BY MR. ORENT:

MR. ORENT: Actual here it is.

MR. ROSS: Thank you.

BY MR. ORENT:

Q. And this is another copy of the index that we were provided. Do you recognize this particular document?

A. Again this looks similar. I can't be certain it's the same document, but again it seems to have fewer entries from what I remember the document I took a look at. I seem to remember the entries between the neighborhood of 400 or just over 400 entries.

Q. And do you recall the date of which that which that document you examined last night was produced?



A. I don't know.

Q. Now, aside from box number, description, beginning date and endate, did the list that you saw contain any additional information?

A. No, those were all the same headings.

Q. Okay. And the information contained within those columns, does that appear to be of the same type, for example, under description, the box No. 1 we see FRG and A journal E and T would that be the same -- would there be more information than that in the version that you saw previously?

MR. ROSS: Objection to form.

A. I can't say again that this is exactly the same list that I've seen, but it appears very similar. I don't recall anything that looks different on the descriptions.

Q. Now between exhibits five and exhibit six, you'll note that there are?

MR. ROSS: Four and five.

MR. ORENT: Four and five, right.

Q. There are more documents on Exhibit 5 than Exhibit 6; is that right?

MR. ROSS: When you say documents, you mean box numbers.



MR. ORENT: The more entries more box numbers.

A. Yes there are more listing of box entries on Exhibit 5 than on Exhibit 4.

Q. And how is it that you are able to find boxes 39 through 389 to amend your list on what is now Exhibit 5?

A. I don't know.

Q. What process was used to identify those documents?

MR. ROSS: When you say those, you mean only the additional ones --

MR. ORENT: Right.

MR. ROSS: -- or all of them?

Q. What process was used to identify boxes 369 through 389?

A. Would it help if I gave a general description of the process to identify boxes of materials --

Q. No, I'm looking particularly with those boxes.

A. With respect to these individual boxes, I don't know.

Q. When did the search for those particular boxes begin?

A. Those specific boxes, I don't know.

Q. Now, you said in the version that you examined

last night, you believe that it went even further than 389; is that correct?
A. That's correct.
Q. And do you know how many boxes were contained in that you saw that last night?
A. I believe I saw entries as high as 417.
Q. And between 39389 and 417 those boxes which are not on either exhibits four and five, do you know what method was used to locate those boxes?
A. Those specific boxes, noing.
Q. Do you know what search requirements were used to identify the documents in those boxes?
A. The search requirements would have been any documents that were responsive to plaintiffs' requests.
Q. Okay.
A. And privileged.
Q. Do you know when the search began for those documents?
A. Those specific be entries, no.
Q. Do you know the criteria that was used to identify boxes one through 368?
A. My understanding is that these are all boxes that may contain responsive information to plaintiffs' production requests.



Q. And is that the same criteria for boxes 369 through 417?
A. Yes.
Q. So how is it that you weren't able to identify boxes 369 through 417 at the same time that you identified boxes one through 368?
MR. ROSS: Objection to form.
A. Yeah, assuming that they were responsive to existing requests, it would be the first question, and they may well have -- there may be a number of reasons. One the request came in later for other responsive documents. Requests tend to be continuing in nature and it could easily be that additional documents were identified subsequent to the initial list of 360-some-odd documents.
Q. Now, are you familiar with the coding system on the outside of these boxes?
A. No.
Q. Who would be familiar with the coding system on the outside of the boxes?
A. My understanding is that all of these boxes are kept by a third party storage provider. Capital records and that individuals within capital records would be knowledgeable about the coding system.



Q. Now, there is a location code on some of these boxes for example, box 387 location, H14-11-05-02E. Is it your testimony that that would be a number that would be assigned to that particular box from capital records as opposed to by New England Gas Company?
A. I don't know anything about the coding on that particular box.
Q. Okay.
MR. ROSS: Do you know about the coding on any boxes?
THE WITNESS: No.
Q. There's a location coding system in addition to a count coding system, have you aware of that --
A. No.
Q. -- on the outside of these boxes?
A. No, I'm not.
Q. Okay.
Q. Does New England Gas or strike that. Does Southern Union retain any New England Gas boxes or records in either Austin, Texas or Houston, Texas?
A. My understanding is that all records responsive or covered by the notice, the January 30th, notice relating to historical records of New England Gas Company are kept by capital records in Rhode Island.



Q. Were any of the documents produced in this case produced from some source that were -- strike that.
Were any of the documents produced by New England Gas Company in this case relating to their historical operations, were any of those documents stored at a site other than capital records?
A. I can't tell you exactly what was produced in this case, but the records with respect to the fall rifle gas facilities, the historic operations they would have all come from the cap tool records facility.
Q. And what is the date range that capital records maintains records for?
A. I don't know.
Q. Does Capital Records retain records from the period prior to 1900?
A. Some of these documents are I believe labeled prior to that time frame, so I assume so, but I have not reviewed the contents of any of the boxes, so I can't say. I believe I saw.
Interruption by court reporter.
A. I believe I saw some entry in here prior to 1900 but I may have been mistaken.
A. In reviewing these lists, I don't see anything prior to 1900.

Q. Have you reviewed the record retention policies for New England Gas Company?
A. There is no written record retention -- let's try that again. There is no written record retention policy for New England Gas Company with respect to the Fall River Gas documents.
Q. Did Fall River Gas have a written records retention policy?
A. Not to our knowledge.
Q. Have you ever undertaken, and by you I mean Southern Union, or New England Gas, ever undertaken to go through and document each and every document within the boxes that appear on Exhibits four and five?
A. My understanding is no. Wait a minute.
Could you please read back the question?
(Record Read)
MR. ROSS: Just object to the form. Go ahead.
A. My understanding is the documents have been reviewed for possible responsiveness, but that there has been no compilation of each and every document in the 400 some-odd boxes.
Q. Now, it's my understanding that New England Gas has over a thousand boxes; is that correct?
A. I don't know.



Q. Does Fall River Gas -- strike that.
Does New England Gas have in its custody boxes in excess of that 417?
A. With respect to?
Q. Fall River Gas records. Are there other records?
A. With respect to historical records this would be inclusive with those records. With respect to Charles Street if a if a kilt and Fall River Gas. But with respect to more current records, New England Gas Company would likely have some current operating records in order to conduct daily business about but historical records, are there more than the 417 boxes.
MR. ROSS: Whether or not they're responsive to your requests?
MR. ORENT: Whether or not they're responsive to the requests?
A. I don't know.
Q. Is Capital Records the only site in which you maintain your historical records?
A. Yes.
MR. ROSS: Objection; asked and answered.
A. My understanding is that capital regards is the only location that historical Fall River Gas records



are being kept.
Q. Okay. At any period in time, did Fall River Gas donate any of its documents to any libraries?
A. I don't know.
Q. At any period in time did Fall River Gas donate any of its historical documents to any private collections?
A. I don't know.
Q. At any period in time did Fall River Gas donate any of its historical documents or records to universities?
A. I don't know.
Q. Did New England Gas Company at any period in time donate any of its historical records to anybody?
MR. ROSS: Just note that the four prior questions plus this one are not within the scope of anything within this notice, but I will not direct the witness not to answer the question. So you can answer the question if you remember.
A. No, I don't know.
Q. Okay.
Q. I want to go through the methods that were used to select and identify first the 368 box. What methods were used generally?



A. Generally, counsel for New England Gas Company had discussions with a Miss Ann Connor, who is a senior paralegal or at the time was senior paralegal for New England Gas Company and identified what are potentially identified documents been located.
Q. After that discussion, what happened next?
A. Then counsel would have gone to Capital Records and attempted to identify responsive materials.
Q. Did Miss Connor create any kind of document to guide in terms in their search of documents?
A. I don't know.
Q. Who would know?
A. Counsel and Miss Ann Connor.
Q. Were any forms or surveys used to find the documents that were responsive to the plaintiffs' requests?
A. My understanding is no.
Q. What do you know by you are understanding?
A. I've been so advised by counsel.
Q. But you're speaking as the company now. So I'm going to ask you again, were any forms or surveys used of any kind?
A. And my --
MR. ROSS: He answered the question saying my

understanding is no.
A. Yeah, I'll stay with my answer.
Q. Was there a criteria ever used to determine whether the production of any particular document was responsive to plaintiffs' request?
MR. ROSS: Just objects to the form of the question, vague same objection that we made in writing to criteria used.
A. Again, my understanding is that any documents that were responsive to plaintiffs' request and non-privileged would have been the criteria.
Q. Has a privilege log been produced?
MR. ROSS: Objection assumes there was any documents logged.
A. Yeah it was my understanding with respect to the historical documents that have been provided in those 400 some odd boxes there was no privilege log generated nor were there any privileged type of documents identified.
Q. Okay. When were -- when was the search conducted to identify these 417 boxes?
A. The search began in January of 2006 and I believe went through portions of 2008.
MR. ROSS: Can we consult for one moment?



THE VIDEOGRAPHER: The time is 4:-- excuse me 2:49 we're going off the record.
MR. ORENT: Before we do go off.
MR. ROSS: There is no pending question.
MR. ORENT: There is no pending question I want to make sure you're not talking about the substance. As long as you're talking about structure there's no objection.
THE VIDEOGRAPHER: The time is 2:49. We're going off the record.
(Short Recess)
MR. ROSS: Okay. Ready to go back on.
THE VIDEOGRAPHER: The time is 2:50. We're back on the record.
A. Counsel reminded me that there were privileged documents identified in the reviews, but none that were responsive to the requests.
Q. Okay. Was a review done of all 417 boxes, the contents of those boxes?
MR. ROSS: Asked and answered.
A. I'll stay with my previous answer.
Q. Which was?
A. Which was can you read back my previous question and previous answer?



MR. ORENT: You can read it back, please.
(Interruption from court reporter)
A. I'll make it easier, the documents were reviewed for responsiveness.
Q. Over what period of time were these documents reviewed in the first 368 boxes?
A. I can't.
Q. That were produced?
A. I can't say which documents were reviewed when.
Q. Were they reviewed by counsel or representatives of New England Gas?
A. My understanding was the review of the documents was done by counsel.
Q. Do you know how long this review took?
A. No, I don't.
Q. Was Miss Ann Connor ever present for any of the review?
A. I don't believe so.
Q. Why don't you tell me a little bit about Miss Ann Connor. I believe you testified she currently is a paralegal at New England Gas Company; is that right?
A. No,.



MR. ROSS: Objection to form.
A. That's not quite right. Miss Connor was a particle legal with New England Gas Company, I'm not sure when she left the organization, but she left the organization probably within the last year and a half. And was no longer with New England Gas Company, but for a period of time she was a senior paralegal with New England Gas Company.
Q. And what were her duties with New England Gas Company while he was employed with you?
MR. ROSS: This goes beyond the scope of the notice but I will allow to you answer if you know.
A. I don't know exactly.
Q. Okay. How is it that she had the knowledge as to the location of these particular documents?
A. Well, one of her roles would have been coordinating litigation and document retrieval within New England Gas Company.
Q. And it's in that capacity she was able to identify the location of these documents?
A. Yes.
Q. Okay.
Q. Aside from Capital Records, were documents maintained separately by stone and Webster?